BARRY, CHAIRMAN, RACING AND WAGERING
BOARD OF NEW YORK, ET AL. *v.* BARCHI

No. 77–803.   Argued November 7, 1978—Decided June 25, 1979

56

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN, POWELL, and REHNQUIST, JJ., joined. BRENNAN, J., filed an opinion concurring in part, in which STEWART, MARSHALL, and STEVENS, JJ., joined, *post*, p. 68.

*Robert S. Hammer,* Assistant Attorney General of New York, argued the cause for appellants. With him on the brief were *Louis J. Lefkowitz,* Attorney General, and *Samuel A. Hirshowitz,* First Assistant Attorney General.

*Joseph A. Faraldo* argued the cause and filed a brief for appellee.*

MR. JUSTICE WHITE delivered the opinion of the Court.

The New York State Racing and Wagering Board (Board) is empowered to license horse trainers and others participating in harness horse-race meets in New York.[1] The Board also issues regulations setting forth the standards of conduct that a horse trainer must satisfy to retain his license.[2] Among

---

*Briefs of *amici curiae* urging affirmance were filed by *Dominic H. Frinzi* and *Joseph F. Asher* for Harness Horsemen International, Inc.; by *Philip P. Ardery* for the Horsemen's Benevolent and Protective Association; and by *Roger D. Smith* for the Jockeys' Guild, Inc.

*O. Carlysle McCandless, Miles M. Tepper, Ira A. Finkelstein,* and *Ruth D. MacNaughton* filed a brief for the New York Racing Association, Inc., as *amicus curiae.*

[1] New York Unconsol. Laws § 8010 (1) (McKinney 1979) authorizes the "state harness racing commission," whose powers are now exercised by the New York State Racing and Wagering Board, see §§ 7951–a, 8162 (McKinney 1979), to "license drivers and such other persons participating in harness horse race meets, as the commission may by rule prescribe . . . ." See also 9 N. Y. C. R. R. § 4101.24 (1975).

[2] The Board has issued, in particular, a series of rules specifying a trainer's responsibility for the condition of horses under the trainer's care, 9 N. Y. C. R. R. §§ 4116.11, 4120.5, 4120.6 (1974):

"4116.11. *Trainer's responsibility.* A trainer is responsible for the condition, fitness, equipment, and soundness of each horse at the time it is declared to race and thereafter when it starts in a race."

"4120.5. *Presumptions.* Whenever [certain tests required to be made on horses that place first, second, or third in a race] disclose the presence

other things, the rules issued by the Board forbid the drugging of horses within 48 hours of a race and make trainers responsible for the condition and soundness of their horses before, during, and after a race.[3]    A trainer is forbidden to permit a horse in his custody to start a race "if he knows, or if by the exercise of reasonable care he might have known or have cause to believe" that a horse trained by him has been drugged.[4]

in any horse of any drug, stimulant, depressant or sedative, in any amount whatsoever, it shall be presumed:

"(a) that the same was administered by a person or persons having the control and/or care and/or custody of such horse with the intent thereby to affect the speed or condition of such horse and the result of the race in which it participated;

"(b) that it was administered within the period prohibited [by § 4120.4 (d), see n. 3, *infra*]; and

"(c) that a sufficient quantity was administered to affect the speed or condition of such animal.

"4120.6.    *Trainer's responsibility*.    A trainer shall be responsible at all times for the condition of all horses trained by him.    No trainer shall start a horse or permit a horse in his custody to be started if he knows, or if by the exercise of reasonable care he might have known or have cause to believe, that the horse has received any drug, stimulant, sedative, depressant, medicine, or other substance that could result in a positive test.    Every trainer must guard or cause to be guarded each horse trained by him in such manner and for such period of time prior to racing the horse so as to prevent any person not employed by or connected with the owner or trainer from administering any drug, stimulant, sedative, depressant, or other substance resulting in a positive test."

[3] Title 9 N. Y. C. R. R. § 4120.4 (1974) provides in part:

"No person shall, or attempt to, or shall conspire with another or others to:

"(a) Stimulate or depress a horse through the administration of any drug, medication, stimulant, depressant, hypnotic or narcotic.

.        .        .        .        .

"(d) Administer any drug, medicant, stimulant, depressant, narcotic or hypnotic to a horse within 48 hours of its race."

See also § 4116.11, quoted in n. 2, *supra*.

[4] 9 N. Y. C. R. R. § 4120.6 (1974), quoted in n. 2, *supra*.

Every trainer is required to "guard or cause to be guarded each horse trained by him in such manner . . . as to prevent any person not employed by or connected with the owner or trainer from administering any drug . . . ."[5] And when a postrace test, which must be administered to horses finishing first, second, or third, reveals the presence of drugs, it is to be presumed—subject to rebuttal—that the drug "was either administered by the trainer or resulted from his negligence in failing to adequately protect against such occurrence."[6]

On June 22, 1976, Be Alert, a harness race horse trained by appellee, John Barchi, finished second in a race at Monticello Raceway. Two days later, Barchi was advised by the Board steward that a postrace urinalysis had revealed a drug in Be Alert's system. Barchi proclaimed his innocence, and two lie-detector tests supported his lack of knowledge of the drugging. On July 8, relying on the trainer's responsibility rules and the evidentiary presumption arising thereunder, the steward suspended Barchi for 15 days, commencing July 10.[7] Under § 8022 of the New York Uncon-

---

[5] *Ibid.*

[6] *Barchi* v. *Sarafan,* No. 76 Civ. 3070 (SDNY, Dec. 23, 1976), reprinted in App. to Juris. Statement 24a; see *Barchi* v. *Sarafan,* 436 F. Supp. 775, 784 (SDNY 1977); App. 25a (affidavit of John Barchi). The Assistant Attorney General of New York interpreted the presumption in this way both before the three-judge court and in oral argument before this Court:

"QUESTION: What this is is a presumption to get the matter started and that can be rebutted by other evidence.

"MR. HAMMER: Absolutely, Your Honor. This is a permissive presumption. It is a rule of evidence, nothing more." Tr. of Oral Arg. 7. See *id.,* at 5; Tr. 33–34 (trainer not held absolutely responsible for drugging of horse "if it is shown that the trainer was not culpable, that he, himself, could not administer the drug and he was not found to be negligent in supervising the people under him").

[7] Title 9 N. Y. C. R. R. § 4105.8 (f) (1974) authorizes presiding judges "[w]here a violation of any rule is suspected to conduct an inquiry promptly and to take such action as may be appropriate . . . ." New

solidated Laws,[8] a suspended licensee is entitled to a post-suspension hearing, but the section ordains that "[p]ending such hearing and final determination thereon, the action of

York Unconsol. Laws § 8010 (2) (McKinney 1979) states the grounds for revocation or suspension:

". . . The commission may suspend or revoke a license issued pursuant to this section if it shall determine that (a) the applicant or licensee (1) has been convicted of a crime involving moral turpitude; (2) has engaged in bookmaking or other form of illegal gambling; (3) has been found guilty of any fraud in connection with racing or breeding; (4) has been guilty of any violation or attempt to violate any law, rule or regulation of any racing jurisdiction for which suspension from racing might be imposed in such jurisdiction; (5) or . . . has violated any rule, regulation or order of the commission, or [that (b)] the experience, character or general fitness of any applicant or licensee is such [that] the participation of such person in harness racing or related activities would be inconsistent with the public interest, convenience or necessity or with the best interests of racing generally."

[8] New York Unconsol. Laws § 8022 (McKinney 1979) provides in full:

"If the state harness racing commission shall refuse to grant a license applied for under this act, or shall revoke or suspend such a license granted by it, or shall impose a monetary fine upon a participant in harness racing the applicant or licensee or party fined may demand, within ten days after notice of the said act of the commission, a hearing before the commission and the commission shall give prompt notice of a time and place for such hearing at which the commission will hear such applicant or licensee or party fined in reference thereto. Pending such hearing and final determination thereon, the action of the commission in refusing to grant or in revoking or suspending a license or in imposing a monetary fine shall remain in full force and effect. The commission may continue such hearing from time to time for the convenience of any of the parties. Any of the parties affected by such hearing may be represented by counsel, and the commission may be represented by the attorney-general, a deputy attorney-general or its counsel. In the conduct of such hearing the commission shall not be bound by technical rules of evidence, but all evidence offered before the commission shall be reduced to writing, and such evidence together with the exhibits, if any, and the findings of the commission, shall be permanently preserved and shall constitute the record of the commission in such case. In connection with such hearing, each member of the

the [Board] in . . . suspending a license . . . shall remain in full force and effect." The section specifies no time in which the hearing must be held, and it affords the Board as long as 30 days after the conclusion of the hearing in which to issue a final order adjudicating a case. Without resorting to the § 8022 procedures, Barchi filed this suit in the United States District Court.

Barchi alleged that his trainer's license was protected by the Due Process Clause of the Fourteenth Amendment of the United States Constitution and that § 8022 was unconstitutional because it permitted his license to be suspended without a prior hearing to determine his culpability and because a summary suspension could not be stayed pending the administrative review provided by the statute. Barchi also challenged the rule permitting the Board to presume rebuttably from the drugging of a horse that its trainer was responsible. His claim was that "there is no rational connection between the fact proved, that the horse was illegally drugged, and the ultimate fact presumed that the trainer is guilty of the act or carelessly guarded against the act occurring," App. 15a (complaint), it being impossible, Barchi alleged, for the trainer to guard the horse against all those who by stealth might gain

commission shall have the power to administer oaths and examine witnesses, and may issue subpoenas to compel attendance of witnesses, and the production of all material and relevant reports, books, papers, documents, correspondence and other evidence. The commission may, if occasion shall require, by order, refer to one or more of its members or officers, the duty of taking testimony in such matter, and to report thereon to the commission, but no determination shall be made therein except by the commission. Within thirty days after the conclusion of such hearing, the commission shall make a final order in writing, setting forth the reasons for the action taken by it and a copy thereof shall be served on such applicant or licensee or party fined, as the case may be. The action of the commission in refusing to grant a license or in revoking or suspending a license or in imposing a monetary fine shall be reviewable in the supreme court in the manner provided by the provisions of article seventy-eight of the civil practice law and rules."

access to it. Barchi's third claim was that, in prohibiting a stay of his suspension pending administrative review, § 8022 denied him equal protection of the laws, since in the context of' thoroughbred racing, in contrast to harness racing, suspensions can be stayed pending appeal.[9]

The District Court upheld the evidentiary presumption on its face, concluding: "[T]he duty of a trainer to oversee his horses is sufficiently connected to the occurrence of tampering to support the presumption established by the trainer's 'insurer' rules. The state's definition of trainer responsibility is reasonably related to the interests involved and, given the rebuttable nature of the 4120.5 presumption, the high standard of accountability is not unconstitutional." *Barchi* v. *Sarafan*, 436 F. Supp. 775, 784 (SDNY 1977). The District Court went on to hold, however, that § 8022 of the New York law was unconstitutional under the Due Process Clause since it permitted the State "to irreparably sanction a harness race horse trainer without a pre-suspension or a prompt post-sus-

---

[9] The provision applicable to thoroughbred racing, N. Y. Unconsol. Laws § 7915 (3) (McKinney 1979), provides:

"No license shall be revoked unless such revocation is at a meeting of the state racing commission on notice to the licensee, who shall be entitled to a hearing in respect of such revocation. In the conduct of such hearing the commission shall not be bound by technical rules of evidence but all evidence offered before the commission shall be reduced to writing, and such evidence together with the exhibits, if any, and the findings of the commission, shall be permanently preserved and shall constitute the record of the commission in such case. The action of the commission in refusing, suspending or in revoking a license shall be reviewable in the supreme court in the manner provided by the provisions of article seventy-eight of the civil practice law and rules. Such hearing may be held by the chairman thereof or by any commissioner designated by him in writing, and the chairman or said commissioner may issue subpoenas for witnesses and administer oaths to witnesses. The chairman or commissioner holding such hearing shall, at the conclusion thereof, make his findings with respect thereto and said findings, if concurred in by two members of the commission, shall become the findings and determination of the commission."

pension hearing in violation of plaintiff's right to due process." App. to Juris. Statement 2a (order of judgment).[10]   The court further concluded that the difference between the procedures applicable to harness racing and those applicable to thoroughbred racing was so unwarranted as to violate the Equal Protection Clause of the Fourteenth Amendment.

We noted probable jurisdiction of the appeal.   435 U. S. 921 (1978).   In this Court, the appellants adhere to their fundamental position that, as a constitutional matter, Barchi was entitled to no more process than was available to him under § 8022 either before or after the suspension was imposed and became effective.   Barchi, on the other hand, continues to insist that his suspension could in no event become effective without a prior hearing to establish that his horse had been drugged and that he was culpable.

We agree with appellants that § 8022 does not affront the Due Process Clause by authorizing summary suspensions without a presuspension hearing, and we reject Barchi's contrary contention.   In disagreement with appellants, however,

---

[10] The District Court declined to abstain to permit the state courts to construe § 8022 prior to adjudication of Barchi's constitutional claims on their merits.   Appellants had maintained that the provision might be construed to give the Board discretion to stay suspensions pending the outcome of the postsuspension hearing provided by § 8022.   The District Court thought the language of the statute unequivocally foreclosed that construction.   We cannot say that the District Court erred in this respect. Section 8022 provides that, pending a full hearing and final determination thereon, "the action of the [Board] in . . . suspending a license . . . *shall* remain in full force and effect."   (Emphasis added.)   The provision gives no assurance of a presuspension or prompt postsuspension hearing and determination.   And it makes clear that the Board need not reach a determination until "thirty days after the conclusion of [the] hearing."

We reject appellants' further contention that Barchi should not have commenced suit prior to exhausting the procedure contemplated under § 8022.   Under existing authority, exhaustion of administrative remedies is not required when "the question of the adequacy of the administrative remedy . . . [is] for all practical purposes identical with the merits of [the plaintiff's] lawsuit."   *Gibson* v. *Berryhill,* 411 U. S. 564, 575 (1973).

we conclude that Barchi was not assured a sufficiently timely postsuspension hearing and that § 8022 was unconstitutionally applied in this respect.

It is conceded that, under New York law, Barchi's license could have been suspended only upon a satisfactory showing that his horse had been drugged and that he was at least negligent in failing to prevent the drugging. As a threshold matter, therefore, it is clear that Barchi had a property interest in his license sufficient to invoke the protection of the Due Process Clause.[11] We do not agree with Barchi's basic contention, however, that an evidentiary hearing was required prior to the effectuation of his suspension. Unquestionably, the magnitude of a trainer's interest in avoiding suspension is substantial; but the State also has an important interest in assuring the integrity of the racing carried on under its auspices. In these circumstances, it seems to us that the State is entitled to impose an interim suspension, pending a prompt judicial or administrative hearing that would definitely determine the issues, whenever it has satisfactorily established probable cause to believe that a horse has been drugged and that a trainer has been at least negligent in connection with the drugging. Cf. *Gerstein* v. *Pugh,* 420 U. S. 103, 111–112 (1975); *Mitchell* v. *W. T. Grant Co.,* 416 U. S.

---

[11] Under New York law, a license may not be revoked or suspended at the discretion of the racing authorities. Cf. *Bishop* v. *Wood,* 426 U. S. 341 (1976). Rather, suspension may ensue only upon proof of certain contingencies. See N. Y. Unconsol. Laws § 8010 (McKinney 1979), quoted in n. 7, *supra.* Notably, when a horse is found to have been drugged, the license of the horse's trainer may be suspended or revoked if he did the drugging, if he knew or should have known that the horse had been drugged, or if he negligently failed to prevent it. Accordingly, state law has engendered a clear expectation of continued enjoyment of a license absent proof of culpable conduct by the trainer. Barchi, therefore, has asserted a legitimate "claim of entitlement . . . that he may invoke at a hearing." *Perry* v. *Sindermann,* 408 U. S. 593, 601 (1972); see *Board of Regents* v. *Roth,* 408 U. S. 564 (1972); *Bell* v. *Burson,* 402 U. S. 535, 539 (1971); *Goldberg* v. *Kelly,* 397 U. S. 254 (1970).

600, 609 (1974); *Bell* v. *Burson,* 402 U. S. 535, 542 (1971). In such circumstances, the State's interest in preserving the integrity of the sport and in protecting the public from harm becomes most acute. At the same time, there is substantial assurance that the trainer's interest is not being baselessly compromised.

Under this standard, Barchi received all the process that was due him prior to the suspension of his license. As proof that Barchi's horse had been drugged, the State adduced the assertion of its testing official, who had purported to examine Barchi's horse pursuant to prescribed testing procedures. To establish probable cause, the State need not postpone a suspension pending an adversary hearing to resolve questions of credibility and conflicts in the evidence. At the interim suspension stage, an expert's affirmance, although untested and not beyond error, would appear sufficiently reliable to satisfy constitutional requirements.

As for Barchi's culpability, the New York trainer's responsibility rules, approved by the District Court, established a rebuttable presumption or inference, predicated on the fact of drugging, that Barchi was at least negligent. In light of the duties placed upon the trainer by the trainer's responsibility rules, we accept this inference of culpability as defensible and would not put the State to further presuspension proof that Barchi had not complied with the applicable rules. Furthermore, although Barchi was not given a formal hearing prior to the suspension of his license, he was immediately notified of the alleged drugging, 16 days elapsed prior to the imposition of the suspension, and he was given more than one opportunity to present his side of the story to the State's investigators. In fact, he stated his position in the course of taking two lie-detector examinations. He points to nothing in the record demonstrating convincingly that he was not negligent, and the State's investigators apparently failed to unearth an explanation for the drugging that would completely exonerate

him. Even if the State's presuspension procedures, then, were not adequate finally to resolve the issues fairly and accurately, they sufficed for the purposes of probable cause and interim suspension.

That the State's presuspension procedures were satisfactory, however, still leaves unresolved how and when the adequacy of the grounds for suspension is ultimately to be determined. As the District Court found, the consequences to a trainer of even a temporary suspension can be severe; and we have held that the opportunity to be heard must be "at a meaningful time and in a meaningful manner." *Armstrong* v. *Manzo,* 380 U. S. 545, 552 (1965). Here, the provision for an administrative hearing, neither on its face nor as applied in this case, assured a prompt proceeding and prompt disposition of the outstanding issues between Barchi and the State. Indeed, insofar as the statutory requirements are concerned, it is as likely as not that Barchi and others subject to relatively brief suspensions would have no opportunity to put the State to its proof until they have suffered the full penalty imposed. Yet, it is possible that Barchi's horse may not have been drugged and Barchi may not have been at fault at all. Once suspension has been imposed, the trainer's interest in a speedy resolution of the controversy becomes paramount, it seems to us. We also discern little or no state interest, and the State has suggested none, in an appreciable delay in going forward with a full hearing. On the contrary, it would seem as much in the State's interest as Barchi's to have an early and reliable determination with respect to the integrity of those participating in state-supervised horse racing.

In these circumstances, it was necessary that Barchi be assured a prompt postsuspension hearing, one that would proceed and be concluded without appreciable delay. Because the statute as applied in this case was deficient in this respect, Barchi's suspension was constitutionally infirm under the Due Process Clause of the Fourteenth Amendment.

The question remains whether the State's prohibition of administrative stays pending a hearing in the harness racing context without a like prohibition in thoroughbred racing denies harness racing trainers equal protection of the laws. The District Court acknowledged that the inquiry in this respect is "whether or not the classification is without a reasonable basis." 436 F. Supp., at 783. Put another way, a statutory classification such as this should not be overturned "unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational." *Vance* v. *Bradley,* 440 U. S. 93, 97 (1979). In holding that § 8022 violated the Equal Protection Clause, the District Court misapplied this standard. The legislative history of § 8022 makes clear that the section and other provisions applicable to harness racing resulted from a legislative conclusion that harness racing should be subject to strict regulation,[12] and neither Barchi nor the District Court has demonstrated that the acute problems attending harness racing also plague the thoroughbred racing industry. Barchi has not shown that the two industries should be identically regulated in all respects; he has not convinced us that "the legislative facts on which the classification is apparently based could not reasonably be conceived to be

---

[12] In response to the slaying of a union official who represented employees at a harness track and the resulting disclosure of "a pattern of activities . . . clearly inimical to the public interest," Governor Dewey appointed a commission to inquire into the general regulation of harness tracks. N. Y. Legis. Doc. No. 86, 177th Sess., 3 (1954). The investigation disclosed that harness racing had become "a lush and attractive field for every kind of abuse." *Id.,* at 4; see Report of the New York State Commission, in Public Papers of Governor Thomas E. Dewey 505 (1954). The Commission· recommended major changes in the harness racing laws, including enactment of the provisions of § 8022 ruled unconstitutional by the District Court. See 1954 N. Y. Laws, ch. 510, § 8; Report of the New York State Commission, *supra,* at 512.

true by the governmental decisionmaker." *Vance* v. *Bradley, supra,* at 111. It was not the State's burden to disprove by resort to "current empirical proof," 440 U. S., at 110, Barchi's bare assertions that thoroughbred and harness racing should be treated identically.

It also seems clear to us that the procedural mechanism selected to mitigate the threats to the public interest arising in the harness racing context is rationally related to the achievement of that goal. The State could reasonably conclude that swift suspension of harness racing trainers was necessary to protect the public from fraud and to foster public confidence in the harness racing sport. Accordingly, we think the District Court erred in disapproving the difference in the procedural courses applicable to harness racing and thoroughbred racing.

We thus affirm the judgment of the District Court insofar as it ruled Barchi's suspension unconstitutional for lack of assurance of a prompt postsuspension hearing. We reverse its judgment, however, to the extent that it declared § 8022 unconstitutional under the Equal Protection Clause of the Fourteenth Amendment. The judgment of the District Court is accordingly affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.[13]

*It is so ordered.*

Mr. Justice Brennan, with whom Mr. Justice Stewart, Mr. Justice Marshall, and Mr. Justice Stevens join, concurring in part.

I agree that the District Court properly declined either to abstain in this case or to require exhaustion of state remedies

---

[13] We express no view on whether the procedures under § 8022, as that section may have been modified by subsequent legislation, satisfy the strictures of the Due Process Clause. After the District Court rendered its decision, the Appellate Division of the New York Supreme Court

that were themselves being challenged as unconstitutional.[1]

I also agree that appellee's trainer's license clothes him with a constitutionally protected interest of which he cannot be deprived without procedural due process. What was said of automobile drivers' licenses in *Bell* v. *Burson,* 402 U. S. 535,

nullified a Board order summarily suspending a veterinarian's license to practice medicine at racetracks on the ground that the Board had not made "any finding that the public health, safety, or welfare imperatively required such emergency action as a suspension prior to a hearing." *Gerard* v. *Barry,* 59 App. Div. 2d 901, 399 N. Y. S. 2d 876 (1977). The court relied on § 401 (3) of the State Administrative Procedure Act, N. Y. State Admin. Proc. Act § 401 (3) (McKinney Supp. 1977), which provides:

"If the agency finds that public health, safety, or welfare imperatively requires emergency action, and incorporates a finding to that effect in its order, summary suspension of a license may be ordered, effective on the date specified in such order or upon service of a certified copy of such order on the licensee, whichever shall be later, pending proceedings for revocation or other action. These proceedings shall be promptly instituted and determined."

Section 401 (3) did not take effect until September 1, 1976, two months after Barchi was suspended. The section has no bearing on the constitutionality of procedures under § 8022 as applied to persons like Barchi who were suspended prior to its effective date. See N. Y. State Admin. Proc. Act § 103 (3) (McKinney Supp. 1977).

[1] I also agree that the Court need not address the District Court's holding that the rebuttable presumption of trainer responsibility is constitutional; appellee did not cross appeal, and he is not to be heard upon the challenge to that holding made in his brief, since agreement with that challenge would result in greater relief than was awarded him by the District Court. See *FEA* v. *Algonquin SNG, Inc.,* 426 U. S. 548, 560 n. 11 (1976); *United States* v. *Raines,* 362 U. S. 17, 27 n. 7 (1960).

Lower court decisions conflict on the question whether an *irrebuttable* presumption of trainer responsibility is constitutional. Compare *Brennan* v. *Illinois Racing Board,* 42 Ill. 2d 352, 247 N. E. 2d 881 (1969) (irrebuttable presumption unconstitutional), with *Hubel* v. *West Virginia Racing Comm'n,* 513 F. 2d 240 (CA4 1975) (irrebuttable presumption constitutional). See generally Note, Brennan v. Illinois Racing Board: The Validity of Statutes Making a Horse Trainer the Absolute Insurer for the Condition of His Horse, 74 Dick. L. Rev. 303 (1970).

539 (1971), is even more true of occupational licenses such as Barchi's:

"Once licenses are issued, . . . their continued possession may become essential in the pursuit of a livelihood. Suspension of issued licenses . . . involves state action that adjudicates important interests of the licensees. In such cases the licenses are not to be taken away without that procedural due process required by the Fourteenth Amendment."

See *Dixon* v. *Love,* 431 U. S. 105, 112 (1977); *Gibson* v. *Berryhill,* 411 U. S. 564 (1973); cf. *New Motor Vehicle Bd. of Cal.* v. *Orrin W. Fox Co.,* 439 U. S. 96 (1978). *Board of Regents* v. *Roth,* 408 U. S. 564 (1972), stated, in identifying protected interests, that *Bell* v. *Burson* was an example of situations in which "[t]he Court has . . . made clear that the property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money."[2]

Appellants seek to avoid these cases by characterizing appellee's license as a "privilege" and arguing that one who has accepted the benefits of a license is precluded from challenging the conditions attached to it, including the procedures for suspension and revocation. See *Arnett* v. *Kennedy,* 416 U. S. 134 (1974) (plurality opinion). The Court properly rejects this contention—indeed, does not even mention it. *Board of Regents* v. *Roth, supra,* at 571, emphasized that "the

---

[2] 408 U. S., at 571–572. *Roth* explained that "[t]o have a [protected] property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.,* at 577. No extended inquiry into the formal and informal "rules or understandings that secure certain benefits and that support claims of entitlement to those benefits," *ibid.,* is necessary here. Cf. *Perry* v. *Sindermann,* 408 U. S. 593, 599–603 (1972). Appellee's claim to an entitlement in his duly issued trainer's license is confirmed by the state statutes authorizing the issuance of licenses. See N. Y. Unconsol. Laws § 8010 (McKinney 1979).

Court has fully and finally rejected the wooden distinction between 'rights' and 'privileges' that once seemed to govern the applicability of procedural due process rights." Having once determined that the interest at stake is protected by the Due Process Clause, a court has occasion only to inquire what process is due. See *Dixon* v. *Love, supra,* at 112; *Mathews* v. *Eldridge,* 424 U. S. 319, 332–333 (1976).

Turning then to the question whether the procedures available to Barchi satisfied the mandates of due process, appellants argue that the State's interests in protecting horses and in protecting the repute of racing and the State's income derived from racing justify summary suspensions of trainers' licenses when traces of drugs are allegedly found in their horses' urine.[3] Prior decisions establish that "[b]efore a person is deprived of a protected interest, he must be afforded opportunity for some kind of a hearing, 'except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event,'" *Board of Regents* v. *Roth, supra,* at 570 n. 7, quoting *Boddie* v. *Connecticut,* 401 U. S. 371, 379 (1971); see *Smith* v. *Organization of Foster Families,* 431 U. S. 816, 848 (1977); *Bell* v. *Burson, supra,* at 542. Even where a State's

---

[3] Cf. *Hubel* v. *West Virginia Racing Comm'n, supra,* which described West Virginia's interests as follows:

"The state has at least two substantial interests to be served. It has a humanitarian interest in protecting the health of the horse, and it has a broader and more weighty interest in protecting the purity of the sport, both from the standpoint of protecting its own substantial revenues derived from taxes on legalized pari-mutuel betting and protecting patrons of the sport from being defrauded. . . . If a horse is fleeter or slower than his normal speed because of having been drugged, the integrity of the race is irretrievably lost. Of course, if stimulated, his artificial position at the finish may be corrected and he may be deprived of any purse that he apparently won. But the interests of bettors cannot be protected. Winning tickets must be paid promptly at the end of the race before the disqualification of the horse, except for the most obvious reasons, can be accomplished." 513 F. 2d, at 243–244.

72

interests justify action, after only summary informal proceedings, that temporarily infringes on protected interests pending a later full hearing, that full hearing must be available *promptly* after the temporary deprivation occurs. See *North Georgia Finishing, Inc.* v. *Di-Chem, Inc.,* 419 U. S. 601 (1975); *Goldberg* v. *Kelly,* 397 U. S. 254, 266–267 (1970). In any event,

> "[t]his Court consistently has held that some form of hearing is required before an individual is finally deprived of a property interest. [Citations omitted.] The 'right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society.' *Joint Anti-Fascist Comm.* v. *McGrath,* 341 U. S. 123, 168 (1951) (Frankfurter, J., concurring). The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' *Armstrong* v. *Manzo,* 380 U. S. 545, 552 (1965). See *Grannis* v. *Ordean,* 234 U. S. 385, 394 (1914)." *Mathews* v. *Eldridge, supra,* at 333.

The District Court held in this case that "[o]n balance . . . the absence of either a pre-suspension hearing or a *prompt* post-suspension hearing denie[d Barchi] the meaningful review due process requires." *Barchi* v. *Sarafan,* 436 F. Supp. 775, 782 (SDNY 1977). I agree with the District Court and with the Court that the absence of an opportunity for a prompt postsuspension hearing denied Barchi due process. Given the "in the alternative" phrasing of the District Court's judgment and the absence of a cross-appeal by Barchi,[4] however, I would not reach the question whether due process required a presuspension hearing in this case. Even assuming that the presuspension procedures afforded Barchi satisfied due proc-

[4] See n. 1, *supra.*

ess in light of the State's allegedly substantial interests,[5] the State has failed to identify any substantial interest in postponing Barchi's opportunity for a full hearing once Barchi's license was suspended. Yet the District Court found that no opportunity for an immediate postsuspension full hearing was available. Furthermore, the District Court found that, in harness racing, even a temporary suspension can irreparably damage a trainer's livelihood. Not only does a trainer lose the income from races during the suspension, but also, even more harmful, he is likely to lose the clients he has collected over the span of his career.[6] Where, as here, even a short

---

[5] My reservation of the presuspension hearing issue does not imply agreement with the Court on this matter. The record in this case, in my view, raises serious doubts that the alleged state interests in this context are sufficient to justify postponing a trainer's hearing until after his suspension. See *Mackey* v. *Montrym, ante,* at 25–26 (STEWART, J., dissenting). The asserted importance of New York's interests in summary action is plainly depreciated by the State Board's claimed practice of staying suspensions when appropriate. See Tr. of Oral Arg. 10–12; Tr. 27–30; affidavit of John M. Dailey, Aug. 26, 1976, App. 34a. Moreover, in this case 16 days elapsed between the positive urine test and the suspension order. These practices are hardly consistent with appellants' claim that summary suspensions are necessary to serve important state interests whenever a drug test is positive.

[6] "Race horse trainers may be entrusted with the care of a number of trotters at any given time. A trainer's income is derived in large measure from the proceeds of horse races (as opposed to a salary), and, since, harness 'meetings' are sporadic, trainers cannot recapture the racing opportunities lost by missed meetings. Once a trainer is suspended, even for a brief period, an owner will immediately seek the services of another trainer so that the horse is not barred from racing. This change is often permanent in order to avoid further disruption in the care of the animal. Significantly, plaintiff has proffered the affidavit of a third-party trainer/driver who experienced just such a loss during a suspension for a similar drug infraction. He had also suffered irreparable damage for a subsequent *ex parte* suspension that was later reversed. Racing opportunities lost because of a suspension cannot be recovered by a later reversal in [a] review hearing for obvious reasons. Furthermore, defendants do not

temporary suspension threatens to inflict substantial and irreparable harm, an "initial" deprivation quickly becomes "final," and the procedures afforded either before or immediately after suspension are *de facto* the final procedures. A final full hearing and determination after Barchi had been barred from racing his horses and had lost his clients to other trainers was aptly described by the District Court as an "exercise in futility," 436 F. Supp., at 782, and would certainly not qualify as a "meaningful opportunity to be heard at a meaningful time." To be meaningful, an opportunity for a full hearing and determination must be afforded at least at a time when the potentially irreparable and substantial harm caused by a suspension can still be avoided—*i. e.,* either before or immediately after suspension.

I therefore join those parts of the Court's opinion holding that the District Court properly refused to abstain or to require exhaustion and that the procedures available to Barchi failed to satisfy the requirements of due process because they did not assure a suspended trainer an opportunity for an immediate postsuspension full hearing and determination. In light of this holding, of Barchi's failure to cross appeal from the judgment of the District Court, and of possibly significant changes in the procedures applicable to all future suspensions,[7] I would not reach the additional questions whether Barchi was constitutionally entitled to a *pre*-suspension hearing and whether the difference between the procedures in harness racing and those in flat racing violates the Equal Protection Clause.

---

dispute the fact that a loss of horses in a trainer's stable occasioned during his suspension can often be an irremediable injury, even though such suspension is erroneous and without justification." *Barchi* v. *Sarafan,* 436 F. Supp. 775, 778 (SDNY 1977).

See affidavit of John Barchi, July 12, 1976, App. 23a; affidavit of Lucien Fontaine, Aug. 17, 1976, App. 39a.

[7] See *ante,* at 68–69, n. 13.

Accordingly, I would affirm the judgment of the District Court insofar as it nullifies Barchi's suspension because the procedures applicable to his case at the time of his suspension did not satisfy due process. Like the Court, I express no view as to the constitutionality of procedures under § 8022 as it may have been modified by subsequent legislation; I would therefore vacate that portion of the District Court's judgment that declares § 8022 unconstitutional and enjoins its enforcement.