CLAY, Circuit Judge,
dissenting.
This case involves a number of contested factual issues and competing interests that should ultimately be resolved at trial. After hearing the testimony of multiple witnesses, applying the preliminary injunction standard to the case, and weighing the parties’ interests, the district court concluded that a preliminary injunction was appropriate to maintain the status quo until a trial can be held. Because I agree that the plaintiff taxicab owners present a likelihood of success on the merits of their procedural due process claim, and because, under a balancing of the equities, I share the district court’s concern that the source of Plaintiffs’ livelihood is at stake, I believe this Court should affirm the district court’s grant of a preliminary injunction.
I.
A number of material facts are disputed in this case, so some background is in order. Prior to 2007, taxis were allowed to pick up fares at Cleveland Hopkins International Airport (“Hopkins”) on a first-come first-served basis, and taxis from seven taxicab companies operating in the Cleveland area waited in a taxi queue for fares. In September 2006, the Cleveland Department of Port Control, led by director Ricky Smith, issued a Request for Proposals (“RFP”), soliciting applications and bids for an exclusive contract to pick up passengers from the airport. The RFP required that an applying taxicab company demonstrate a minimum of seven years of continuous service, fifty or more cabs and one million dollars of annual gross revenue.
To introduce the RFP, representatives of the Department of Port Control invited *846 all area taxicab companies to an orientation meeting at Hopkins. Director Ricky Smith also held a separate meeting for minority business owners. Following the distribution of the RFP, Hopkins received proposals from the three largest taxicab companies in the Cleveland area: Ace, Americab, and Yellow Cab, the only companies that were able to satisfy the criteria set forth in the RFP. The proposals were reviewed by an evaluation committee and the committee recommended that Ace Taxi Service be granted an exclusive contract.
Smith sought approval of the contract award from the Cleveland City Council (“City Council”), but Yellow Cab was dissatisfied with the committee’s decision and lobbied City Council. On December 4, 2006, City Council held a hearing where various taxi companies, including Plaintiffs’ companies, testified regarding the effect an exclusive contract would have on their business. After hearing this testimony, City Council passed Ordinance 1781-A-06 which gave the Department of Port Control the option to retain the current open system of taxi service, award the contract to Ace Taxi Service, or award the contract to a limited number of companies.
The Department of Port Control subsequently awarded Ace, Americab, and Yellow Cab prorated shares of the taxi service. Smith met with representatives of Plaintiffs’ companies — the same minority-owned businesses who were invited to the initial RFP meeting with Smith — to inform them of this decision. Smith sent a letter to Plaintiffs’ counsel informing Plaintiffs that Hopkins would go forward with the exclusive outbound service plan, and on October 9, 2007, Plaintiffs were informed by telephone that they would not be able to send taxis to the airport the next day because the plan was going into effect.
Plaintiffs filed suit against the City of Cleveland (“the City”) and Ricky D. Smith two days later, alleging breach of contract, discrimination based on national origin, procedural due process violations, and violations of their substantive due process and equal protection rights. They sought compensatory and consequential damages and a preliminary and permanent injunction.
The district court conducted a preliminary injunction hearing on November 13, 2007 and heard testimony from several witnesses. Plaintiffs — ethnic minorities from Somalia, Ethiopia, India, and Pakistan — testified that they had been harassed by airport police and the taxi queue starters, who systematically ticketed minority drivers while using racial epithets and anti-immigrant slurs, and that their complaints to the police and airport authorities had been ignored. They also testified that separate meetings had been held for minority cab owners, and that they felt that the qualifying criteria set forth in the RFP had been written in such a way as to discriminate against them.
Richard Herman, a lawyer who assisted taxicab owners in earlier interactions with the City, testified that a number of drivers contacted him to express concerns that airport police discriminated against minority drivers and repeatedly used racial epithets and anti-immigrant slurs. He testified that his group began to write letters to the mayor and the director of community relations to raise issues of “ethnic strife,” and that the national origin and race of his clients permeated the relationship they had with the city. He testified that he helped the drivers put together a “Call to Action” to voice their concerns in February 2006, prior to the issuance of the RFP. Defendants attempted to limit testimony regarding incidents at the airport, but Plaintiffs argued that discrimination is a hidden activity.
In addition, Plaintiffs Kashmir Sing, Abdi Omar, Desalegn Sisay, and Harjit *847 Dhillon also presented evidence that the outbound airport service constituted 85 to 90% of their business and that the new system would put them out of business within a week to ten days, if not immediately.
Defendant Ricky Smith testified that the RFP was issued for legitimate business reasons. He stated that the exclusive contract plan would create a source of revenue because the airport would be able to charge the taxicab service $8 per trip. He also stated that the new system would decrease competition and enable stricter regulation, which would address complaints about competitive taxi drivers attempting to intimidate customers. He testified that the complaints he heard were not associated with any particular racial or ethnic group, and that he believed the underlying tensions stemmed from issues of supply and demand.
Smith testified that he held a separate meeting for minority business owners to “reach out to them” and to help them understand what they could do to take advantage of the new program. He stated that he felt a separate meeting was necessary because “minority owned business do not feel comfortable sharing some of the concerns and challenges that they have in the presence of majority business owners out of fear they may be black-balled or cast aside.” (Joint Appendix (“J.A.”) at 239.)
On November 20, 2007, 2007 WL 4171646, the district court granted a preliminary injunction, holding that Plaintiffs had sustained their burden of demonstrating a strong likelihood of success on their due process claim. Defendants appealed and the matter is now before this Court.
II.
This Court reviews a district court’s order granting a preliminary injunction for abuse of discretion. Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp., 511 F.3d 535, 540 (6th Cir.2007). In so doing, this Court reviews the district court’s factual findings for clear error and its legal conclusions de novo. Id. at 541.
A district court must consider four factors in deciding whether to issue a preliminary injunction: “(1) the plaintiffs likelihood of success on the merits; (2) whether the plaintiff may suffer irreparable harm absent the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of an injunction upon the public interest.” Tucker v. City of Fairfield, 398 F.3d 457, 461 (6th Cir.2005) (quoting Deja Vu of Nashville, Inc. v. Metro. Gov’t of Nashville and Davidson County, 274 F.3d 377, 400 (6th Cir.2001)). We have advised that these four factors are “factors to be balanced, not prerequisites that must be met,” and that “the district court’s weighing and balancing of the equities is overruled only in the rarest of cases.” Six Clinics Holding Corp., II v. Cafcomp Systems, 119 F.3d 393, 400 (6th Cir.1997).
Although the district court’s decision that a litigant is likely to succeed on the merits is a legal question that is reviewed de novo, “the district court’s ultimate determination as to whether the four preliminary injunction factors weigh in favor of granting or denying preliminary injunctive relief is reviewed for abuse of discretion.” Certified Restoration Dry Cleaning Network, 511 F.3d at 541. “The district court’s determination will be disturbed only if the district court relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard.” Id. (citations omitted).
A.
To demonstrate a likelihood of success on the merits of a procedural due process *848 claim, Plaintiffs must establish three elements: “(1) that they have a life, liberty, or property interest protected by the Due Process Clause of the Fourteenth Amendment ..., (2) that they were deprived of this protected interest within the meaning of the Due Process Clause, and (3) that the state did not afford them adequate procedural rights prior to depriving them of their protected interest.” Med. Corp., Inc. v. City of Lima, 296 F.3d 404, 409 (6th Cir.2002) (quoting Hahn v. Star Bank, 190 F.3d 708, 716 (6th Cir.1999)). Plaintiffs are likely to succeed on each of these elements.
i.
First, Plaintiffs are likely to establish that they have a property interest that is constitutionally protected.
Property interests “may take many forms.” Bd. of Regents v. Roth, 408 U.S. 564, 576, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). One of these forms is a license, so long as the license can be suspended only upon specified conditions. See, e.g., Mackey v. Montrym, 443 U.S. 1, 12-13, 99 S.Ct. 2612, 61 L.Ed.2d 321 (1979) (holding that it was clear that the Due Process Clause applies to a state’s suspension or revocation of a driver’s license); Barry v. Barchi, 443 U.S. 55, 64, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979) (holding that a horse trainer’s license was constitutionally protected because the state had engendered an expectation of continued enjoyment in it absent culpable conduct); Wojcik v. City of Romulus, 257 F.3d 600, 610 (6th Cir.2001) (explaining that a holder of a liquor license has a constitutionally protected interest, particularly when expenditures have been made in reliance on it).
In this case, Plaintiffs rely on their taxicab licenses to operate their businesses and have a well-founded expectation that the licenses will not be revoked absent culpable conduct. Chapter 443 of the Cleveland Code of Ordinances, which governs the operation of taxicab services, provides that licenses can be revoked or suspended “if the vehicle is used for immoral or illegal purposes, or if the vehicle is not in good condition, clean or safe,” C.C.O. § 443.12, or “upon conviction for any violation of this chapter [Chapter 443, Taxicabs].” C.C.O. § 443.36. Importantly, the ordinances specify that “before suspending or revoking [a] license, the Commissioner shall afford the licensee the opportunity of a hearing upon the charges.” C.C.O. § 443.21. Like in Barry, the City has set forth the conditions under which the license can be suspended and has “engendered a clear expectation of continued enjoyment of a license absent proof of culpable conduct.” 443 U.S. at 64, 99 S.Ct. 2642.
Courts have held that property interests in licenses are particularly strong where, as in this case, plaintiffs depend on the licenses for their livelihood. In Bell v. Burson, the Supreme Court explained that “a clergyman whose ministry require[d] him to travel by car” had a protected property interest in his driver’s license, because “[o]nce licenses are issued ... their continued possession may become essential in the pursuit of a livelihood. Suspension of issued licenses thus involves state action that adjudicates important interests of the licensees. In such cases the licenses are not to be taken away without that procedural due process required by the Fourteenth Amendment.” 402 U.S. 535, 539, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971). Revocation of a taxicab license impacts Plaintiffs’ livelihood even more directly than does the revocation of a driver’s license, and Plaintiffs’ property interests in their licenses must not be transgressed for invidious or improper reasons.
Defendants claim, and the majority opinion agrees, that even if Plaintiffs’ interest *849 in their licenses are protected, they have no protected interest in particular business opportunities at the Hopkins Airport. This formulation misstates the issue. In Med. Corp., this Court acknowledged, concurrent with our sister circuits, that while a city can certainly impose conditions that decrease a company’s business opportunities, a city cannot impose conditions that render a license valueless without providing procedural protections. 296 F.3d at 412.[9] The reasoning behind this proposition is sound: if a city or state could de facto suspend the license without satisfying the requirements of the due process clause, the protections provided to such interests would be substantially diminished. The impact of such a rule would be particularly unjust in cases, like the instant case, where there is a factual dispute as to whether the defendant’s actions are motivated by discriminatory intent.[10]
In line with this reasoning, the Med. Corp. Court discussed Reed, a case where proprietors of a music venue that served alcohol claimed that village officials deprived them of their property rights in their liquor license by engaging in a pattern of official harassment. The alleged harassment included “arresting customers and employees on baseless charges, demanding proof of age from customers who obviously were many years over the legal drinking age, and bringing groundless proceedings,” and ultimately forced the plaintiffs to close their establishment and surrender their liquor license. Med. Corp., 296 F.3d at 412 (quoting Reed, 704 F.2d at 947). In Reed, the court concluded that, although “the defendants never succeeded in taking away the plaintiffs’ license either by revocation or nonrenewal,” village officials still “deprived” the plaintiffs of their property interests in the liquor license under the due process clause. 704 F.2d at 949.
In the instant case, like in Reed, the record is replete with evidence that the City’s proposed actions would render Plaintiffs’ licenses valueless.[11] Moreover, like in Reed, if Plaintiffs’ version of events is believed, it would be particularly unjust to allow a city to target particular individuals based on minority ethnicity, small business status, or other such reasons by cre *850 ating an end-run around the due process clause.
Despite evidence of the detrimental effects of the new policy on Plaintiffs, Defendants maintain that the policy does not entirely deprive Plaintiffs of the benefit of their licenses, and argue that there are ample opportunities for Plaintiffs to provide services from downtown Cleveland to the airport. This is a matter of degree and is a factual issue for the district court to consider. Plaintiffs offered testimony that inbound airport drop-offs are insufficient to sustain them companies and that Hopkins’ new policy would put them out of business notwithstanding those opportunities. The district court had wide discretion to credit that testimony, and there is no basis for this Court to find that factual finding to be clearly erroneous. In sum, because Plaintiffs can demonstrate that they have a protected interest in their licenses and that the City’s proposed policy would destroy the value of their licenses, Plaintiffs have a substantial likelihood of proving that they were deprived of a constitutionally protected property interest.
ii.
Plaintiffs must also demonstrate that “the state did not afford them adequate procedural rights prior to depriving them of their protected interest.” Hahn v. Star Bank, 190 F.3d at 716. It is “fundamental” that the notice and the opportunity to be heard be granted “at a meaningful time and in a meaningful manner.” Hamdi v. Rumsfeld, 542 U.S. 507, 533, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (internal citations and quotation marks omitted). In reviewing state action in this area, we look to substance, not to bare form to determine whether constitutional requirements have been honored. Bell v. Burson, 402 U.S. 535, 542-43, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971). A hearing “which excludes consideration of an element essential to the decision [of] whether licenses ... shall be suspended” is not meaningful. Id. at 542, 91 S.Ct. 1586.
The district court properly concluded that the procedures established by Defendants were inadequate.[12] First, Defendants issued a RFP that contained conditions — including requirements that the companies have seven years experience, 50 cabs, and one million dollars in gross revenue per year — which by their very terms excluded Plaintiffs from the bidding process. The record contains evidence that Defendant Smith was aware of this impact on Plaintiffs and that he set up separate meetings to inform prospective winners and losers of the new minimum qualifications.[13] The district court properly observed that “[although the Court does not take issue with Defendants’ desire to ensure that the taxicab companies providing service at Hopkins are financially sound and reputable, the fact that the lines drawn excluded every cab company which was also excluded form the initial meeting with Smith is salient.” (J.A. at 42.)
The City argues that Plaintiffs had an opportunity to voice their concerns at a *851 City Council meeting, and that the procurement process was further reviewed by the Board of Control as a continuation of the RFP process. However, the record contains evidence that none of these meetings or procedures considered reopening or modifying the bidding process in a way that would allow Plaintiffs to apply; the purpose of these procedural steps was to look at the proposals of the existing bidders.[14] These steps did not change the fact that Plaintiffs were excluded as candidates from the moment the RFP was issued.
Considering the substance and not the bare form of what has transpired, see Bell, 402 U.S. at 542-43, 91 S.Ct. 1586, and considering that the right to notice and an opportunity to be heard “must be granted at a meaningful time and in a meaningful manner,” see Hamdi, 542 U.S. at 533, 124 S.Ct. 2633, it is obvious that Plaintiffs were not provided a meaningful opportunity to be heard. Consequently, Plaintiffs demonstrate a likelihood of success on the merits of them due process claim.
B.
In deciding whether to issue a preliminary injunction, courts must also consider whether a plaintiff will suffer “irreparable harm” absent the injunction. Tucker, 398 F.3d at 461. As discussed above, several Plaintiffs presented evidence that they would go out of business almost immediately absent the injunction. This type of financial impact constitutes “irreparable harm.” See Warren v. City of Athens, 411 F.3d 697, 711-712 (6th Cir.2005) (plaintiff showed irreparable harm by showing they would “likely go out of business”); Performance Unlimited, Inc. v. Questar Publishers, Inc., 52 F.3d 1373, 1382 (6th Cir.1995) (“financial ruin qualifies as irreparable harm”); Basicomputer Corp. v. Scott, 973 F.2d 507, 511-12 (6th Cir.1992) (competitive losses constitute irreparable harm). This factor also supports the issuance of an injunction.
C.
Finally, we must consider whether granting the injunction will cause substantial harm to others, and the impact of an injunction upon the public interest. Tucker, 398 F.3d at 461. Defendants claim that the preliminary injunction would cause substantial harm to the cab companies that were awarded exclusive contracts — Ace, Yellow Cab and Amerieab — because, at the time the district court issued its preliminary injunction order, the companies had already purchased new taxicabs that are unsuitable for general use.[15] If the companies did not have exclusive contracts with the airport and the volume increases they had expected, Defendants argue that those companies would face a substantial loss in them investment.
The district court found that any harm to these companies could be averted because Plaintiffs agreed to purchase these new vehicles if the injunction were imposed. While the record is unclear as to how the district court would implement such an agreement, this fact alone does not obviate the need for an injunction. Further, it is unlikely that the injunction would cause substantial injury to the pub- *852 lie. There appear to be sufficient cabs available to service airport customers with or without the injunction, and the injunction would merely maintain the system that has been in place for years at the airport. Given the competing interests in the case, the district court could reasonably conclude that maintaining that system until trial would be the least disruptive and most equitable course of events.
In sum, the aforementioned factors — the likelihood of success on the merits, the potential harm to the plaintiffs and others, and impact of the injunction on the public interest — are “factors to be balanced, not prerequisites that must be met.” Six Clinics Holding Corp., II, 119 F.3d at 400. Balancing these factors, and providing strong deference to district court’s weighing and balancing of the equities, the district court’s grant of an injunction with respect to Plaintiffs’ due process claim should be affirmed.
III.
While the majority and district court opinions focus on Plaintiffs’ due process claim, Plaintiffs also have raised a potentially viable discrimination claim under 42 U.S.C. § 1981.
In their complaint, Plaintiffs allege that Defendants discriminated against the Plaintiffs based upon their national origin in violation of 42 U.S.C. § 1981, which prohibits racial discrimination in the making and enforcing of contractual relationships. The district court concluded that Plaintiffs did not establish a prima facie case of discrimination because it found that, under Saint Francis College v. Al-Khazraji, 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987), national origin is not a protected class under § 1981. A close reading of Saint Francis College decision points us in the opposite direction. In that case, the Supreme Court stated “we have little trouble in concluding that Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of them ancestry or ethnic characteristics ... whether or not it would be classified as racial in terms of modern scientific theory.” Id. at 613, 107 S.Ct. 2022. This Court has since acknowledged Saint Francis College as a case that stands for a “broad” or “expansive” view of racial discrimination under § 1981, and applied it to conclude that a claim of discrimination based on “ancestry or ethnic characteristics” was cognizable under § 1981. Amini v. Oberlin College, 259 F.Sd 493, 502-503 (6th Cir.2001).
Although Plaintiffs do state, in asserting the § 1981 claim in their complaint, that they were discriminated against because they are “first generation immigrants,” this terminology seems to refer to the fact that Plaintiffs come from a variety of ethnic groups — Somalian, Pakistani, Indian, and Ethiopian. Section 1981 does not require that plaintiffs be from a single minority ethnic group or that they use a prescribed term each time they discuss discrimination. Moreover, any imprecision is later cured because the complaint goes on to say that Plaintiffs have suffered discrimination based on “national origin and/or ancestry.” Applying Saint Francis College, 481 U.S. at 613, 107 S.Ct. 2022, and looking at the substance of Plaintiffs’ claims, it is clear that Plaintiffs state a cognizable claim of discrimination based on national origin under § 1981.[16]
*853 As discussed above, Plaintiffs presented evidence of harassment by airport police and personnel, including the use of racially derogatory language. Likewise, they presented evidence that they had raised concerns regarding “ethnic strife” months pri- or to the issuance of the RFP. This could all support a belief the RFP was written ■with the intent to exclude minority cab owners and drivers. Regardless of whether Plaintiffs ultimately prevail on their discrimination claim, evidence regarding this claim should not be disregarded based on a conclusion that Plaintiffs failed to allege “race” discrimination. Therefore, while I would respect the district court’s decision not to grant a preliminary injunction on the basis of that claim, I believe the district court should give further consideration to Plaintiffs’ § 1981 claim.
IY.
In sum, I conclude that Plaintiffs have established a likelihood of success on their due process claim and a potentially viable discrimination claim. Given the interests at stake, a district court could properly conclude that the preliminary injunction factors support the issuance of an injunction. Remembering that a district court’s weighing and balancing of the equities should be overruled only in the “rarest of cases,” Six Clinics Holding Corp., II, 119 F.3d at 400, this Court should affirm the court’s order and continue the injunction until this matter is resolved at trial. Therefore, I respectfully dissent.

. The Med. Corp. Court cited Stidham v. Peace Officer Standards and Training, 265 F.3d 1144, 1153 (10th Cir.2001) (holding that a state official's action in disseminating damaging information about the plaintiff that prevented him from obtaining employment constituted effective revocation of plaintiff's certification to work as a peace officer); Westborough Mall, Inc. v. City of Cape Girardeau, 794 F.2d 330, 336 (8th Cir.1986) (holding that the operation of an automatic re-verter provision forced appellants to give up construction of a shopping center and therefore deprived them of their property rights, "even though the zoning classification was never actually reverted or revoked”); and Reed v. Village of Shorewood, 704 F.2d 943, 949 (7th Cir.1983) (discussed infra).

. While Plaintiffs' procedural due process and discrimination claims must be analyzed separately, the facts of this case create some inherent overlap in the claims. Plaintiffs allege that the City’s actions were motivated by discriminatory intent, and they presented evidence to support their position. Considering these allegations and the fact that the licenses are the source of Plaintiffs' livelihood, the need for procedural protections is particularly compelling.

.At the preliminary injunction hearing, Plaintiff Kashmir Sing testified regarding the effect of the new policy on his company, Airport Taxi. Before the new policy, outbound service from Hopkins made up 85% of Airport Taxi's business, and Sing employed 32 drivers. By the time of the preliminary injunction hearing, Sing had only four drivers and expected to go out of business in a week to ten days if the preliminary injunction was not granted. Plaintiffs Abdi Omar, Desalegn Si-say, and Haijit Dhillon offered comparable testimony.

. Having found that Plaintiffs do not possess a protected property interest, the majority opinion does not address the adequacy of the procedural rights that were afforded to Plaintiffs.

. Plaintiffs testified that Smith met with the prevailing cab companies — Yellow Cab, Ace, and Americab — at 9:00 a.m. on September 11, 2006 without Plaintiff cab companies present to discuss the RFP. He then met with Plaintiff cab companies separately at 11:00 a.m. that day. As discussed above, Defendant Smith acknowledged in the preliminary injunction hearing that he purposefully set up a separate meeting for the minority-owned cab companies because "minority owned business do not feel comfortable sharing some of the concerns and challenges that they have in the presence of majority business." (J.A. at 239.)

. At the Preliminary Injunction hearing, Defendant Smith testified that the subcommittee of the Board of Control was directed to look at the existing bidders. He explicitly stated that “it was not the scope of the ... Board of Control to expand the procurement process or to reopen the procurement process. It was simply to review the ongoing procurement process.” (J.A. at 245.)

. Defendants claim that the newly-purchased taxicabs are not suited for general use because they are marked as airport taxis and are not equipped with meters due to the grid system of payment imposed by the airport.

. The district court also seems to have been persuaded by an alternative argument that even if Plaintiffs had stated a proper claim of race-based discrimination, the evidence did not support such a claim because Ace — one of the three cab companies awarded a contract — is owned by a member of a protected class (a first-generation immigrant from India). This observation alone does not defeat *853 Plaintiffs' claim, and the claim warrants further consideration.