Arthur Lance BIER, Plaintiff,

v.

Paul D. FLEMING, Jr., Henry Stehmeyer, Charles I. Alatis, Defendants.

Civ. A. No. C78–26.

United States District Court, N. D. Ohio, E. D.

Aug. 25, 1981.

On Request for Attorney's Fees Sept. 25, 1981.

Jack N. Turoff, Cleveland, Ohio, for plaintiff.

William McDonald, George E. Lord, Asst. Attys. Gen., Columbus, Ohio, for Fleming and Stehmeyer.

John G. Papandreas, David S. Felman, Co.L.P.A., Cleveland, Ohio, for Alatis.

Richard W. Ross, Asst. Atty. Gen., Columbus, Ohio, for state defendants.

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

Plaintiff Arthur Lance Bier, a harness horse driver-trainer, alleges that on August 12, 1977, he was deprived of his right to drive during the Painesville Meet at Northfield Park Racetrack by the defendant, Painesville President and General Manager, Charles Alatis. Bier further alleges that Alatis, together with defendants Paul Fleming, Jr., and Henry Stehmeyer (Executive Secretary of the Ohio State Racing Commission, and one of its employees, respectively), caused the Ohio State Racing Commission to revoke Bier's license on August 24, 1977, without a hearing, in violation of Ohio Revised Code § 119.06 and the due process clause of the Fourteenth Amendment. Further, Bier alleges that these defendants continued to conspire to violate his civil rights by interfering with his driving rights in the State of Ohio, which resulted in the Ohio Racing Commission refusing to issue him a license for 1978; and that on January 2, 1978, defendants Fleming and Stehmeyer directed the Presiding Judge at Northfield Park to remove Bier from his drives, thereby causing him to lose income and damaging his reputation in his profession. Plaintiff brought this action under the Fourteenth Amendment and 42 U.S.C. §§ 1983 and 1985, seeking injunctive relief, compensatory and punitive damages, attorney's fees and costs. Bier also alleged state law claims of libel and slander, pursuant to 28 U.S.C. § 1332.

Prior to trial this Court dismissed Bier's claims under 42 U.S.C. § 1985, as well as his state law claims. In addition, the Ohio

State Racing Commission was dismissed on Eleventh Amendment grounds. Bier proceeded to trial on his due process claims under the Fourteenth Amendment and 42 U.S.C. § 1983. This Court has jurisdiction.

Upon consideration of the evidence adduced at trial, the Court finds that defendant Alatis, acting under color of state law, did deprive Bier of his right to drive at Northfield Park on August 12, 1977, without due process of law in violation of the Fourteenth Amendment and § 1983. Further, the Court finds that defendant Fleming did cause Bier's license to be revoked on August 24, 1977, without according him due process as required by the Fourteenth Amendment and § 1983. Both of these defendants are liable to the plaintiff for compensatory damages, attorney's fees, and the costs of this action. An award of punitive damages is not warranted in this case.

There was no evidence to support any of Bier's claims against defendant Stehmeyer; therefore, he is dismissed as a defendant.

### FINDINGS OF FACT

#### I

Plaintiff Arthur Lance Bier, whose sole occupation is that of a harness horse driver-trainer, has been in the harness horse business for twenty-two years. He has been licensed as a driver-trainer since 1961, and has trained and raced horses on various tracks throughout the country. Throughout these years Bier has also worked as a "catchdriver"—*i.e.*, one who races horses that are trained by someone other than himself. In 1974, Bier became licensed as a driver-trainer in the State of Ohio, and began racing at Raceway Park in Toledo. At the end of that year he was the leading driver in Toledo, finishing with the highest percentage in the state, and ranking eleventh in the country. Bier began driving at Northfield Park Racetrack (Northfield) in 1976, racing those horses that he trained and also racing as a catchdriver. As such,

Bier frequently raced horses for Ray Fisher, a licensed owner-trainer of horses, and he was the exclusive driver for Earl Simmons, another owner-trainer.

Defendant Paul D. Fleming, Jr., is and has been since 1963, the Executive Secretary of the Ohio State Racing Commission (Commission), the state agency responsible for regulating horse racing in Ohio. As the full-time executive officer of the Commission, Fleming is responsible for the day-to-day operation of the office, acting as the custodian of records, and performing other details as prescribed by the Commission. Fleming has 25 to 30 employees under his supervision, including Henry Stehmeyer who was, in 1977, the Chief Investigator for the Commission.

Defendant Charles Alatis is the President and General Manager of the Painesville Raceway, Incorporated (Painesville), a permit holder licensed to conduct racing meets in Ohio, pursuant to Chapter 3769 of the Ohio Revised Code. Painesville leases the track and facilities at Northfield to conduct one of four racing meets each year. During its meet, Painesville employs all staff and personnel necessary to conduct the meet, including the racing judges (who are officials of the Commission). The Presiding Judge, who is actually appointed by the Commission, is on the payroll of Painesville, pursuant to Commission Rule 3769–5–27.

In 1977, the Painesville Meet commenced on August 12, and continued to November 12, 1977. Defendant Alatis arrived at Northfield several days prior to the opening of the Painesville Meet to prepare for the operation of the meet. On August 8, 1977, Alatis wrote a letter to Arthur Bier informing Bier that his application for stall space had not been received and that, as a consequence, Bier would be required to vacate the premises at Northfield no later than 12:01 a.m., Friday, August 12, 1977.[1] Bier had not made application for stall space and he testified that he did not intend to apply for stall space during the Painesville Meet.

---

1. Bier had been racing at Northfield during the meet prior to the Painesville Meet. He also had stall space for his horses during the previ-

ous meet; however, the record is not clear as to whether he had horses at Northfield on August 8, 1977.

After Bier received his letter he had a conversation with Alatis in which Alatis informed Bier that he could not drive at "his meet". Alatis then instructed his security people not to admit Bier on the premises at Northfield.

Prior to opening day of the Painesville Meet, Bier was listed in the entry box and on the overnight sheets,[2] as the driver of six horses on August 12. However, Alatis instructed the racing office—*i.e.*, the racing secretary and the judges—not to permit Bier's name to appear on the program as driver of any of the horses that would be racing commencing August 12. Subsequently, Bier's name was removed and he was not programmed to drive any horses on August 12.

On August 12, 1977, Bier filed a Complaint and a Motion for Temporary Restraining Order, which was issued by Judge Krupansky of this Court, in Case No. C77–863. Bier returned to Northfield Park that night and made arrangements with some of the owner-trainers for whom he was originally scheduled to drive, to drive their horses although he was not listed on the program, and even though some of them had already secured other drivers. Presiding Judge William Hufford informed Bier that no late driver changes would be allowed; however, when Bier presented him with the restraining order, Bier was returned to some of his mounts; he lost three drives. Once the driver changes were made there was an announcement over the public address system that Painesville Raceway did not want Arthur Bier to race, and that the only reason he was allowed to race was because of a federal court order.

Alatis testified that he refused to allow Bier to drive because Bier was a catchdriver and, according to Alatis, Painesville Raceway has a longstanding "rule" prohibiting catchdrivers from racing during its meet.[3] Alatis made the determination that Bier was a catchdriver when he "heard" that Bier no longer had training responsibilities.[4] Despite the fact that Alatis knew that on August 6, 1977, Bier was listed on a program of a previous racemeet as a trainer, he never communicated with Bier to find out whether Bier in fact still served in that capacity. While Alatis claimed not to recall Bier specifically, he did admit that he would have instructed the racing judges not to allow catchdrivers to be programmed to drive, if they had no training responsibilities. The "rule", Alatis explained, was to preserve the integrity of the sport and to maintain the confidence of the public.

## II

On August 17, 1977, Bier's attorney wrote a letter to the Chairman of the Commission (with copies to defendant Fleming, and to George Lord, counsel for the Commission), informing the Commission of Alatis' actions and requesting the Commission to immediately order Painesville to permit Bier to continue to drive in the Painesville Meet, subject only to Commission rules. This letter was received by the Commission on August 19, 1977; however, no response was made nor was any action taken by the Commission.

A hearing on Bier's Motion for a Preliminary Injunction, in Case No. C77–863, convened at 1:35 p.m., on August 23, 1977. Because of a prior agreement with Alatis' attorney, Bier dismissed his own attorney

---

2. When a person wishes to enter a horse in a particular race, an entry listing, *inter alia*, the name of the horse, the owner, trainer, and driver, must be placed in the "entry box" (which is controlled by the judges) three days prior to the race. The overnight sheet (which contains information regarding the number and conditions of races, the purse, the names of horses and their post positions, and the driver's name) is then prepared by the racing secretary and placed in the paddock boxes for the information of the horsemen who entered the race.

3. Although Alatis stated this "catchdriver rule" had been in existence for sixteen years, he could not recall whether it was posted or whether it was merely custom. It appeared at trial that no one, except for Alatis, knew of the existence of the rule.

4. As was the case with a great portion of his testimony, Alatis could not recall where he got this information regarding Bier's lack of training responsibility.

and appeared at the hearing *pro se.* All other parties[5] were represented by counsel, including counsel for the Commission, George Lord. At that hearing, William F. Snyder, counsel for both Alatis and the racing secretary, Joseph DeFrank, had the following colloquy with the Court:

> MR. SNYDER: If the Court please, in Case No. 77–863, which is the case which involves Mr. Arthur Lance Bier:
>
> Speaking on behalf of Painesville Raceway, Inc., its General Manager, Charles Alatis, and its Racing Secretary, Joseph DeFrank, we have taken the position previously in this Court, and I take it here of record, that so long as Arthur Lance Bier is licensed by the State of Ohio to act as a driver on harness racing tracks in the State of Ohio, we have no objection and will in no way act to prevent him from driving.
>
> Mr. Bier has not asked for stalls during this present meet, so I would suggest that the issue as between us is totally moot at this time, your Honor; . . .
>
> THE COURT: Mr. Bier, in view of the position taken by the defendants in this action, and in view of the fact that you will not in any way be precluded from driving so long as you maintain your driver's license on a current basis with the State of Ohio, it would appear that the issues raised by your complaint are moot.
>
> Is it your desire to withdraw your complaint and dismiss it?
>
> MR. BIER: Yes, sir.
>
> THE COURT: Very well. * * * Your case is dismissed.

(Transcript of Proceedings, Case No. C77–863, pp. 3–4.)

The following morning, August 24, 1977, between 8:30 and 8:45 a.m., Bier was hand-delivered a letter from the Commission, over Fleming's signature, informing him that it had come to the attention of the Commission that Bier was in "bad standing" before the New York State Racing and Wagering Board and that, pursuant to Commission Rule 3769–3–23(B), his Ohio license was revoked, effective that very day. The Commission letter further advised Bier that he had a right to a hearing on the revocation, upon request, within 30 days.[6] Bier was not programmed and did

---

5. In addition to Alatis, other defendants in that action were Painesville Raceway, Inc.; The Ohio Harness Horsemen's Association, Inc.; the Ohio Racing Commission; William Hufford, the Presiding Judge; Northfield Raceway, Inc.; and Joseph DeFrank, the Racing Secretary.

6. This Court's credulity is taxed by the testimony of defendants and their witnesses concerning this precipitous action by the Commission, and the reasons therefor (including the assertion that it was sheer "happenstance" that the action took place the day after the hearing before Judge Krupansky). Fleming testified that he sent the letter to Bier as a result of an "emergency telephone meeting" held by the Commission on the morning of August 24. He also introduced into evidence Def.'s Exhibit D–1, which was identified as the minutes of that emergency meeting. George Lord, former counsel to the Commission, testified that he was called to the Commission office around mid-day on August 24, and that this telephone "conference" was already in progress. Present in the office were Henry Stehmeyer and Fleming (who was taking part in the telephone conversation). Although Lord was not a participant in the conference call, he identified the telephone voices of the other parties as being those of Chairman Gurvis and William Petro, a Commission member. Lord characterized the telephone conference not as an "emergency meeting" but merely a telephone discussion of "new information" the Commission had recently received that Bier was in bad standing in the State of New York. The purpose of the conference was to determine what to do about the situation. This "new information" apparently came to the attention of the Commission by way of a letter to Stehmeyer, dated August 19, 1977, from a Cyril Rooks, Jr., Assistant Counsel to the New York State Racing and Wagering Board (Def.'s Exhibit D–4). However, it is clear that the substance of the "new information" had already been divulged to the Commission by Bier himself when he applied, on January 6, 1977, for his 1977 license.

(The New York State Racing and Wagering Board had suspended Bier's license when he was arrested on a forged motor vehicle license charge. On June 1, 1976, the New York Supreme Court, Appellate Division, ordered Bier's license reinstated pending a hearing. On June 24, 1976, Bier was granted an Indefinite Temporary Permit to race by the Racing and Wagering Board. A hearing was never held, so it appears that Bier's license was never suspended or revoked in New York (See Goldberg deposition). Therefore, Bier was not subject to Rule 3769–3–23(B) on August 24, 1977.)

not drive on the night of August 24, 1977.[7] He again retained counsel who sent a letter to the Commission on August 25, protesting Bier's license revocation and requesting a hearing. This letter apparently stayed any further action by the Commission, because Bier was permitted to drive. A hearing was held by the Commission at its regular meeting on September 7, 1977, at which time the Commission withdrew Bier's driving privileges in the State of Ohio until he would become eligible in the State of New York. Bier was officially advised of this action by letter dated September 8, 1977. Bier then filed a Notice of Appeal to the Summit County Common Pleas Court, pursuant to Ohio Revised Code, § 119.12. The Commission, and specifically defendant Fleming (who had the responsibility) failed to file a transcript of the Commission's proceedings with the Court, as required by statute, and was found to be in violation of Ohio Revised Code Section 119.12. Consequently, on November 18, 1977, the Common Pleas Court reversed and vacated the Commission's revocation order without hearing the case on the merits.

Meanwhile, shortly after Bier obtained the temporary restraining order of August 12, Alatis had instructed his security people at the racetrack to allow Bier on the track when he was programmed to drive. He further instructed Nick Tagg, Director of Security, to allow Bier into the backstretch area only on the days when Bier was driving or was entering qualifying races. Bier could enter the backstretch in time to warm up horses before a race and could remain long enough to talk with the owner of the horses he drove after a race. However, he was not permitted in the track kitchen, which was the usual congregating place for drivers, owners, trainers and other track people. Sometime after the Summit County appeal, Alatis instructed Billy George, the Presiding Judge, to pick up Bier's badge which admitted him to the backstretch. Consequently, Bier only was allowed on the premises when he was scheduled to drive, approximately 1½ hours prior to a race. He was required to leave the premises immediately after he finished racing. This pattern continued for the duration of the Painesville Meet.

Bier claims that because of his restricted access to the backstretch, he was prevented from accepting job offers that were made to him by some of the owners and trainers at Northfield Park. This claim was supported by the testimony of owner-trainers Simmons and Fisher.

### III

The licensing period for 1978 licenses began in late December, 1977. Ordinarily, persons who seek to have their licenses renewed can file their applications at the racetrack with the Presiding Judge who is authorized by the Commission to accept license applications and fees. Arthur Bier presented his 1978 license application to Billy George, the Presiding Judge at Northfield Park, on December 26, 1977. Prior to that time George had been instructed by Stehmeyer not to accept Bier's license application; instead, George was to refer Bier to the Commission for licensing. Consequently, George refused to accept the application, informing Bier that he would have to get his license at the Commission office in Columbus. Bier and his attorney took the application to George two days later; the application was again refused, and Bier was

Lord further testified that Fleming showed him a proposed letter to be sent to Bier (Def.'s Exhibit D-2) and asked him to approve the letter. After instructing Fleming to delete one line which read, "by action taken by said Commission on August 24, 1977", Lord approved the letter. Lord also advised Fleming and the Commission, at that time, that, under their rules, they could not make this decision by telephone call, but would have to provide Bier a hearing before taking action to revoke his license. Despite this advice, as the alleged minutes of the alleged meeting show, the Commission revoked Bier's license, effective August 24, and sent him a notice of opportunity for hearing.

7. Because Bier became confused, during his testimony, about the events that took place on August 24 vis-a-vis those of August 12, it is unclear whether he was listed on the overnight sheet to drive on August 24, as he had been on August 12, 1977.

again instructed to make application at the Commission office. On December 31, 1977, Bier and his attorney went to the Commission office in an attempt to get Bier's 1978 license. Although it is unclear exactly what took place at the Commission office, one thing is certain—Bier did not receive his 1978 license at that time.

January 2, 1978 was opening night for the 1978 racing season. Arthur Bier was scheduled for four drives on that night; however, Billy George removed Bier from all his mounts and would not allow him to drive. George testified that he took this action because Bier did not have a license, and that pursuant to Commission rules, permit holders could not allow unlicensed drivers to drive in a race. George specifically testified that none of the defendants, and no one from the Commission, instructed him to take this action. On January 5, however, Bier was allowed to return to his mounts. On January 6, 1978, the Complaint in this case was filed and a temporary restraining order, followed by a preliminary injunction, was issued by Judge Green of this Court. Prior to trial, this Court granted defendants Fleming and Stehmeyer's Motion in Limine to restrict evidence received at trial to the date of the filing of the Complaint.

### CONCLUSIONS OF LAW

For Bier to prevail on his claims against the defendants he must establish that there were deprivations of a liberty or property interest within the context of the Fourteenth Amendment; and that the deprivations occurred without due process of law; and that the deprivations were effected by the state, or under color of state law.

#### I. The August 12, 1977 Claim

Bier asserts that he had both a constitutionally protected liberty and property interest in racing horses at Northfield Park during the Painesville Meet, and that his exclusion by Alatis, without a prior hearing, deprived him of due process of law as guaranteed by the Fourteenth Amendment.

**8.** In support of his objection Alatis cites *Rapone v. Painesville Raceway, Inc.*, C77–878 (N.D.Ohio, Sept. 1, 1977), and *Stephens et al v.*

Alatis has entered a continuing objection to the Court's jurisdiction in this case, asserting that "time and time again Painesville Raceway, Inc., has been forced to defend Sec. 1983 actions at great expense and loss of time", only to have courts hold that its actions do not come within the strictures of § 1983.[8] The cases cited by Alatis involved the issue of the allocation of stall space by Painesville during the Painesville Meet. That issue is not present in this case. While it is true that the courts in *Rapone* and *Stephens* held that the requisite state action was not present in those cases, they certainly did not go so far as to suggest that none of Alatis' or Painesville's actions would ever come within the confines of the Fourteenth Amendment or § 1983. The determination of the presence, or absence, of state action for purposes of § 1983 is one that must be made on a case-by-case basis. Therefore, Alatis' objection is not well taken.

In pertinent part, 42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects or causes to be subjected, any citizen of the United States, . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured. . . .

Painesville Raceway, Inc. is a private enterprise that conducts its racing meets on private property it leases from Northfield Raceway, Inc., another private entity. It is well established that for any § 1983 liability to attach to defendant Alatis' or Painesville's alleged wrongful activities, they must act under color of law or with the involvement or authority of the state. *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); *Jack-*

*Painesville Raceway, Inc.*, C80–487, C80–515, C80–522A (N.D.Ohio 1980).

*son v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974).

Bier contends that Alatis' actions constitute state action for purposes of § 1983 because of the complete control exercised over harness racing by the State through the Racing Commission; the mutual economic benefits accruing to both the State and Painesville; the licensing requirements of the State for all persons connected in anyway with harness racing; and the pervasive regulations which govern all horse racing in the State of Ohio. Bier further contends that the State of Ohio and Painesville are partners in harness racing—the State as the "senior partner", establishing the rules and regulations and allocating the profits; Painesville, the "junior partner", conducting the day-to-day operations of the business. Therefore, Alatis, as General Manager of Painesville, is an instrumentality of the State. This very interrelationship between the State of Ohio and this private racing association, Bier argues, establishes the existence of a "symbiotic" relationship like that in *Burton v. Wilmington Parking Authority, supra,* which would constitute state action, thus entitling him to the protections of the Fourteenth Amendment.

■ At the outset, this Court rejects the claim of a symbiotic relationship, or of a partnership between the State of Ohio and private racing associations such that the activities of the private associations are automatically vested with the color of state law. *Cf., Rodic v. Thistledown Racing Club,* C76–932 (N.D.Ohio 1977); rev'd on other grounds, 615 F.2d 736 (6th Cir. 1980); *Puntolillo v. New Hampshire Racing Commission,* 390 F.Supp. 231 (D.N.H.1975). It is true that the Racing Commission has substantial input by way of regulation into the operation of racetracks in Ohio. It is also true that there are mutual financial benefits that inure to the State and to the private permit holders. Moreover, through an extensive and pervasive regulatory scheme, the State continually oversees virtually every detail of the operation of the permit holder's business. However, in *Jackson v. Metropolitan Edison, supra,* the

Supreme Court noted that, "[t]he mere fact that a business is subject to [extensive and detailed] state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment." *Id.,* 419 U.S. at 350, 95 S.Ct. at 453.

■ Under *Jackson,* the inquiry must be, "whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." 419 U.S. at 351, 95 S.Ct. at 453. The challenged activity in this case is Alatis' exclusion of Bier at the beginning of the Painesville Meet on August 12, 1977, on the basis of his so-called "catchdriver rule". Therefore, the specific inquiry here is whether the State of Ohio is sufficiently connected to the act of a heavily state regulated private harness racing association in excluding a licensed driver-trainer from its track, without a hearing, on the basis of a rule of the association, so that the association's action is state action for purposes of § 1983. As the Supreme Court stated in *Burton, supra,* "only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." 365 U.S. at 722, 81 S.Ct. at 860.

■ The sequence of events in this case is crucial. Alatis informed Bier on August 8, 1977 that because no application for stall space has been received, Bier would be required to vacate the premises at Northfield Park. Alatis took this action because he "heard" that Bier no longer had training responsibilities. Alatis then informed Bier that he would not be permitted to drive during the Painesville Meet, and instructed his security people not to allow Bier on the premises. Alatis also instructed the racing officials—*i.e.,* the racing secretary and racing judges—not to allow Bier to be programmed to drive any horses in races commencing on August 12. The racing officials followed Alatis' instructions despite the fact that when the race was drawn and the overnight sheets printed for the August 12 races, Bier was listed as the driver for Earl Simmons and other owner-trainers who had

placed entries in the entry box on August 9. Prior to programming, Simmons was paged to the judges' office where he was informed by Presiding Judge William Hufford that he would have to change drivers because Bier would not be driving. When Simmons questioned this action, Hufford gave Simmons a choice of making the driver change in advance, or paying a fine when he had to make a change later because Bier would not be available.[9]

This is the point at which the State clearly became involved in Alatis' otherwise private actions in this case. It may have been one thing for Painesville's private security personnel to deny Bier admission to the racetrack; however, it was quite another for the racing officials, who had previously allowed Bier to be listed as the driver of various horses to be raced on August 12, subsequently to remove his name or to refuse to program him solely on Alatis' orders. The racing judges (although paid by the private permit holder) are given broad authority, by statute and by the Commission, to enforce the rules of the Commission, including the express power to suspend licenses and to impose fines. (See, *e.g.* Ohio Revised Code § 3769.091; Rule 3769–5–27). Indeed, the Presiding Judge, while paid by the permit holder, is actually appointed by the Commission. (Rule 3769–5–27). He is the representative of the Commission at the racetrack, and has authority over all persons licensed by the Commission, including the private permit holder. Whenever these officials make decisions that affect the actual races at a racetrack, such as Northfield Park, particularly decisions as to who may enter the races, or as to who may drive, they are acting in their official capacities, as Commission representatives, and not as private employees of the permit holder.[10]

At no time did Alatis or the racing officials inquire of Bier as to his training status prior to taking this action. Moreover, the racing officials made no inquiry as to whether Bier's purported lack of training status would have any adverse effect on the horses he would drive or on the races in which he was entered as a driver. They simply summarily excluded Bier, and by so doing they participated in, or "put their weight" behind, Alatis' actions. See *Fitzgerald v. Mountain Laurel Racing, Inc.*, 607 F.2d 589, 599–600 (3d Cir. 1979).

Defendant Alatis attempts to analogize this case to that of *Fulton v. Hecht*, 545 F.2d 540 (5th Cir.), *cert. den.*, 430 U.S. 984, 97 S.Ct. 1682, 52 L.Ed.2d 379 (1977). This case is analogous to *Fulton* only insofar as the regulations, and the mutual financial benefits that inure to the private associations and the States of Ohio and Florida are similar. Here, however, we are dealing with a situation where the State of Ohio does regulate and control who will drive in harness races by issuing driver-trainer licenses, and also by regulating the circumstances under which the licenses, and concomitantly the right to drive, can be taken away. (See, *e.g.*, Rules 3769–3–23, 3769–3–27). The facts here are certainly more akin to those in *Fitzgerald, supra*, where the racing officials actually participated in the challenged activity of the regulated entity, than to those in *Fulton* where the State had no connection with booking contracts at the private kennel club.

The Court finds that not only has the State been shown to be sufficiently connected with the challenged conduct of Alatis to pass the close nexus test of *Jackson*; the State racing officials have been shown to have actually participated in Alatis' actions even more blatantly than did the rac-

**9.** Simmons removed Bier's name and substituted that of Charles Williams. It was only after Bier presented a copy of the federal court's restraining order to Hufford that Bier was permitted to drive, albeit only on some of his previously scheduled mounts.

**10.** The dichotomous situation in which racing judges find themselves is not unlike that of the

proverbial servant trying to serve two masters. Refusing to obey the orders of the permit holder may be tantamount to "biting the hand that feeds" them. However, the solution to this awkward situation lies with the State of Ohio and the Racing Commission, not with this Court.

ing officials in *Fitzgerald.* Because of this intimate involvement by the State, the Court finds Alatis' actions of excluding Bier from racing to be state action for purposes of the Fourteenth Amendment and § 1983.

█ Having found the presence of state action, we now turn to whether Bier had a constitutionally protected interest in racing at Northfield Park during the Painesville Meet. The Ohio Revised Code and the racing rules promulgated by the Commission specifically provide the circumstances under which driver-trainer licenses may be revoked, denied, or suspended. Thus, it is clear that Bier had a property interest in his harness race license sufficient to invoke the protection of the due process clause. See *Barry v. Barchi,* 443 U.S. 55, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979).

Bier's sole occupation is that of a harness race driver and trainer. The only method by which he can engage in his chosen occupation is by training and driving horses in harness race meets. This Court is of the opinion that the right to drive on the racetracks in Ohio and to pursue his occupation, which is derived from the license granted and protected by the state, constitutes a liberty interest within the meaning of the Fourteenth Amendment. See *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Hence, Bier could not be deprived of his interest in driving at Northfield Park during the Painesville Meet without procedural due process.

█ It is undisputed that neither Alatis nor the racing officials held any type of hearing prior to excluding Bier. The due process clause contemplates some kind of prior hearing, however informal, before a person is deprived of a protected interest, "except for extraordinary situations where some valid governmental interest is at stake that justified postponing the hearing until after the event." *Boddie v. Connecticut,* 401 U.S. 371, 377, 91 S.Ct. 780, 785, 28 L.Ed.2d 113 (1971). See *Barry v. Barchi, supra.* Alatis' expressed concern for the

protection of the integrity of racing and conditions of horses as the reason for his "rule" is insufficient to qualify as an extraordinary situation which would warrant Bier's exclusion without a prior hearing.[11] Additionally, there was no evidence that Bier had conducted himself in any manner which would warrant concern by Alatis or the racing officials sufficient to immediately exclude him from racing. In other words, there were no extenuating circumstances present here that would require Alatis and the racing officials to exclude Bier without prior notice and an opportunity to be heard. Moreover, there was no offer made to Bier of a subsequent hearing as required by those cases where extenuating circumstances *do* exist, justifying a deprivation without a prior hearing. See *Barry v. Barchi, supra.* Under these circumstances, due process would require the state, taking the same or similar action, to accord Bier procedural rights. Having found state action here, the same was required of Alatis, and the failure to accord Bier those rights violated the Fourteenth Amendment and § 1983.

### II. The August 24, 1977 Claim

█ There can be no question but that the alleged conduct by defendant Fleming satisfies the "under color of state law" element of this § 1983 action, because he was a state employee in a position of considerable authority. There also can be no question but that Bier had a property interest in his license, on August 24, 1977, which entitled him to the procedural safeguards of the Fourteenth Amendment. See *Barry v. Barchi, supra.*

█ The sole question is whether there was a deprivation of Bier's protected interest in his license on August 24, 1977, without due process of law. Defendant Fleming claims that there was no deprivation on August 24; arguing that the letter to Bier on that date, over Fleming's signature, merely evidenced a determination by the Commission that Bier's license ought to be

---

11. Alatis' concern was unfounded since the insurer and responsibility rules of the Racing Commission (3769–3–22 and 3769–12–02) protect these interests.

revoked, and that Bier would be given an opportunity to be heard. Fleming further contends that he caused this "notice letter" to be sent to Bier after it was approved by counsel; and that he was simply following orders he received from the Commission after its "emergency telephone meeting". This Court has no difficulty construing the August 24 letter to Bier as notice that his license *had been* revoked, and that he would be afforded the opportunity to have a post-revocation hearing.

 Bier contends that his license revocation was in violation of Ohio Revised Code, Section 119.06, which requires that a hearing be provided prior to the revocation. Violation of a state statute, however, does not automatically give rise to a constitutional due process violation. Constitutional due process requires that some form of hearing be provided before an individual is finally deprived of a property interest. Ordinarily, a prior hearing is contemplated, but there are circumstances (as noted above) under which prompt post termination hearings are permissible. While the circumstances of this case do not come within those cases allowing post termination hearings, the Commission did stay its revocation action, and did provide Bier a hearing within two weeks of the revocation decision. However, this is not the problem that the Court has with this case. It is a fundamental requirement of due process that the opportunity to be heard be granted not only at a meaningful time, but also in a meaningful manner *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). One must wonder how meaningful a hearing can be provided an individual when it is held before the same tribunal that had already made the decision to deprive him of his property interest before the hearing was ever held. Indeed, the decision not to accord Bier his procedural rights must be construed as a conscious one in light of the fact that the Commission was advised by its counsel that Bier had to be

afforded a hearing before his license could be revoked. This was not a hearing to show cause why Bier's license should not be revoked, as defendant Fleming contends. Rather, it was a hearing to legitimize an action already taken by the Commission two weeks previously. There was no meaningful opportunity for Bier to be heard under these circumstances. Additionally, any opportunity Bier may have had to receive a fair and impartial review of the Commission's proceedings was frustrated by the fact that defendant Fleming failed (or refused) to file the transcript of the "revocation" proceedings with the Common Pleas Court once Bier had appealed its action.

This Court concludes from the circumstances of this case, that the entire matter of Bier's revocation by the Ohio State Racing Commission, and specifically defendant Fleming's actions, were intricately related to the fact that for some reason, which was never revealed during the trial of this case,[12] neither Alatis nor the Racing Commission wanted Bier to drive during the Painesville Meet. Accordingly, the Court rules that Bier's due process rights were violated by the revocation of his license in this case, and specifically by defendant Fleming's participation in that revocation.

### III. The January 2, 1978 Claim

 To determine whether Bier had a constitutionally protected interest in his license or in driving at Northfield Park on January 2, 1978, the Court must look to Ohio law to ascertain the nature of the license. (See *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548). Ohio Revised Code, § 3769.03 provides that. licenses issued by the Commission to persons engaged in racing "shall be for the period of one year from January first of the year in which" they are issued. Thus, it is clear that, under Ohio law, Bier's 1977 license expired on December 31, 1977.

---

12. Alatis' catchdriver "rule" certainly was not the reason because evidence adduced at trial, including Alatis' own testimony, revealed that a number of catchdrivers continued to enjoy rac-

ing privileges during the Painesville Meet at the same time that Bier was experiencing these difficulties.

It is not necessary to determine whether the Rules of the Commission support a legitimate claim of entitlement to a renewal of Bier's license (See *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570). The only evidence adduced at trial with regard to Bier's January 2, 1978 claim demonstrated that Presiding Judge Billy George removed Bier from his mounts on that date. Although this Court suspects that the events of January 2, 1978 were all a part of the scenario that began in August, 1977, George unequivocally testified that none of the defendants in this case instructed him, or were involved in his decision, to remove Bier from his mounts. There was no other evidence to show that George acted for any reason other than his stated reason—*i.e.,* Bier did not have a 1978 license. Accordingly, Bier's claimed due process violation on January 2, 1978 must be dismissed.

### RELIEF

The basic purpose of a § 1983 damages award is to compensate persons for injuries that are caused by the deprivation of constitutional rights. *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). In this case, the potential for actual loss to plaintiff Bier was greatly minimized by the zealousness of his counsel, who reacted diligently whenever there was an interference by the defendants with Bier's driving rights, or his license. Therefore, the substantial losses to Bier that can actually be computed are probably those he sustained by way of having been required to pay attorney's fees throughout the entire period under question.

█ The only evidence presented at trial with regard to Bier's loss as a result of Alatis' action of excluding him from racing on August 12, 1977, was the three drives lost on that evening. The usual amount that Bier would have been paid for those drives was $10 per drive, or ten percent of the purse of any race he won. Although there was evidence that Bier is an excellent driver who has won many races, the Court certainly cannot speculate that he would have won any of the three races in which he

was not allowed to participate. Accordingly, the Court awards Bier $30 in compensatory damages for the August 12, 1977 due process violation, in addition to attorney's fees.

The Court construes the Complaint as alleging that defendant Fleming acted in his personal as well as in his official capacities. Fleming properly contends that he is immune from Bier's claims for money damages in his official capacity because money damages are barred by the Eleventh Amendment. Fleming further contends that he acted in good faith by relying on the advice of counsel and by acting in accordance with routine office procedures. The Court finds these contentions to be without merit.

█ The evidence shows that Fleming did not rely on the advice of counsel. Counsel advised him that a hearing would have to be provided Bier prior to any revocation action. Despite this advice, Fleming sent the letter to Bier which revoked his license on August 24, 1977, knowing that Bier was entitled to a prior hearing. The Court would hope that this is not routine office procedure for the Ohio Racing Commission.

█ The evidence does not show that Bier lost any drives as a result of the August 24 violation. However, "[b]ecause the right to procedural due process is 'absolute' in the sense that it does not depend on the merits of a claimant's substantive assertions, . . . the denial of procedural due process . . . [is] actionable for nominal damages without proof of actual damages." *Carey v. Piphus, supra* at 267, 98 S.Ct. at 1054. Therefore, the Court finds that he is personally liable to Bier in the amount of $1.00 for compensatory damages. The Court further awards Bier attorney's fees, against defendant Fleming, in both his personal and official capacities.

It is further ordered that plaintiff's counsel prepare and file with the Court documentation of the amount of attorney's fees by September 7, 1981. The defendants may file any objections within ten (10) days thereafter.

The above Findings of Fact and Conclusions of Law are entered pursuant to Rule 52 of the Federal Rules of Civil Procedure. Costs are to be borne by defendants Alatis and Fleming.

IT IS SO ORDERED.

### ORDER

#### On Request for Attorney's Fees

Before the Court is a request for attorney's fees, filed by counsel for plaintiff Arthur Bier, pursuant to this Court's order of August 25, 1981. Both defendants Alatis and Fleming have filed Responses and Objections to Bier's request. Upon consideration, the Court finds defendants' objections to be well taken.

Plaintiff seeks attorney's fees for 1,285.2 hours at rates of $150, $120 and $25 per hour, for a total amount of $100,322.50. In support of this request, counsel has provided the Court with numerous pages listing dates, hours spent, and blanket labels for work performed (*e.g.*, 516 hours are listed as "research", apparently performed by an unidentified law clerk). This case has involved several court actions, aside from the present one, in both state and federal courts, as well as several administrative hearings. In addition, this case was initially brought against four defendants, two of whom have been dismissed, and not all of whom were involved in each aspect of this controversy. Plaintiff does not identify which court actions he is claiming time for, nor does he identify which items apply to which defendants. There are no affidavits or statements as to counsel's hourly rate, or as to the going rate for attorneys with similar experience in similar cases. In short, there is no way this Court can make any determination as to plaintiff's request for attorney's fees based on the statement and itemization filed with this Court. Therefore, plaintiff's request is denied.

The case of *Northcross v. Board of Education*, 611 F.2d 624 (6th Cir. 1979) provides the standard for determining attorneys' fees awards in this circuit. Plaintiff is ordered to file a Motion for Attorney's Fees that comports with the factors in *Northcross*, including affidavits and a brief with appropriate citations in support of this Motion, by October 1, 1981. Defendants will have ten days within which to respond.

IT IS SO ORDERED.