Carl ALLEN, Appellant,

v.

KENTUCKY HORSE RACING AUTHORITY, Successor to the Kentucky Racing Commission, C. Frank Shoop, Frank L. Jones, Jr., Bernard J. Hettel, Sam P. Bowie, Wayne E. Carlisle, Alice H. Chandler, Lon E. Fields, Sr., V.L. Fisher, Jr., M.D., Richard B. Klein, Barbara Tway Partlow, Nathan Sholar and Robert G. Stallings, Appellees.

No. 2003–CA–000869–MR.

Court of Appeals of Kentucky.

May 14, 2004.

Henry E. Davis, Lexington, for appellant.

J. Bruce Miller, Louisville, for appellee, Kentucky Racing Commission.

Before EMBERTON, Chief Judge; BUCKINGHAM and VANMETER, Judges.

## *OPINION*

BUCKINGHAM, Judge.

Carl Allen appeals from an opinion and order of the Franklin Circuit Court affirming a decision by the Kentucky Racing Commission.[1] The KHRA decision disqualified Allen's horse, CR Commando, as the winner of two races held in October 1998 at The Red Mile racetrack in Lexington, Kentucky. Due to the disqualification of the horse in the two races, Allen was required to return the prize money he had collected and was not allowed to share in

its redistribution. We affirm the circuit court's opinion and order.

The KHRA is an independent agency of state government and has the duty to regulate the conduct of horse racing and pari-mutuel wagering on horse racing in the Commonwealth. *See* KRS[2] 230.225(1). One of the purposes of the horse racing statutes is to give the KHRA "forceful control of horse racing in the Commonwealth with plenary power to promulgate administrative regulations prescribing conditions under which all legitimate horse racing and wagering thereon is conducted in the Commonwealth[.]" Further, a purpose of the statutes is to give the KHRA the power "to regulate and maintain horse racing ... free of any corrupt ... or unprincipled horse racing practices, and to regulate and maintain horse racing ... so as to dissipate any cloud of association with the undesirable and maintain the appearance as well as the fact of complete honesty and integrity of horse racing in the Commonwealth." KRS 230.215(2). The KHRA's powers include the power to prescribe "necessary and reasonable administrative regulations and conditions under which horse racing at a horse race meeting shall be conducted in this state[.]" KRS 230.260(3). *See also Kentucky State Racing Comm'n v. Fuller*, Ky., 481 S.W.2d 298, 301 (1972).

Allen owned and trained CR Commando for purposes of harness racing. On October 2, 1998, CR Commando finished first in Race Number 7 at The Red Mile, winning $59,480 in prize money. Five days later, on October 7, 1998, CR Commando finished first in Race Number 3 at The Red Mile, winning $54,762.50 in prize money. Following both races, CR Commando

1. The Kentucky Horse Racing Authority is the successor to the Kentucky Racing Commission. All further references in this opinion to the Kentucky Racing Commission will be made to its successor, the Kentucky Horse Racing Authority (KHRA).

2. Kentucky Revised Statutes.

was given routine urine tests by KHRA officials to check for prohibited foreign substances. *See* 811 KAR [3] 1:090, Section 1(2).

Each urine sample was divided into primary and secondary containers. The two primary samples were sent to Truesdail Laboratories, Inc., in Tustin, California, for testing. The secondary samples were saved and isolated by the KHRA in a locked freezer. *See* 811 KAR 1:090, Section 2(1)(d). Truesdail discovered the presence of flunixin[4] in CR Commando's urine taken from the primary containers associated with each of the two races. The presence of flunixin in the horse's urine constituted a violation of 811 KAR 1:090, Section 4(1).

After the primary urine sample from the first race tested positive for flunixin, Allen was given the option of what to do with the secondary sample taken after that race. *See* 811 KAR 1:090, Section 2(2)(a). He chose to have the secondary sample sent to a different laboratory to test specifically for the presence of flunixin in the urine. That sample was sent to Iowa State University, and its analysis also confirmed the presence of flunixin in the horse's urine. Allen opted to have the secondary sample from the second race sent to Truesdail for a full set of tests. Truesdail again found flunixin in the urine.

The judges who presided over the races thereafter reviewed the test results and listened to Allen's arguments. They ruled that Allen had violated the regulation and ordered him to return the purse money won by CR Commando in each race and to pay a fine of $250 for each violation. Allen appealed the decisions to the KHRA, which heard the case *de novo*. *See* KRS 230.320(3). Following a hearing, a hearing officer recommended that the judges' decision be upheld. The KHRA adopted the recommendations in an order entered on September 12, 2001.

Following the KHRA's issuance of the final order, Allen appealed to the Franklin Circuit Court pursuant to KRS 230.330. In an eight-page opinion and order, the circuit court affirmed the KHRA's decision. Allen then appealed to this court pursuant to KRS 13B.160.

KRS 230.330 states that "[a]ny licensee or any applicant aggrieved by any final order of the commission may appeal to the Franklin Circuit Court in accordance with KRS Chapter 13B." KRS 13B.150(2) provides in relevant part that "[t]he court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact." Also, that statute provides that the court may affirm or reverse, in whole or in part, the final order of an administrative agency and may remand the case for further proceedings if it finds that the agency's order was in violation of constitutional or statutory provisions, was in excess of the agency's statutory authority, was not supported by substantial evidence, was arbitrary, capricious, or characterized by abuse of discretion, was based on an ex parte communication which substantially prejudiced the rights of any party and likely affected the outcome of the hearing, was prejudiced by a failure of the person conducting a proceeding to be disqualified pursuant to KRS 13B.040(2), or was deficient as otherwise provided by law. KRS 13B.150(2). Further, "[a]ny aggrieved party may appeal any final judgment of the Circuit Court under this chapter to the Court of Appeals in accordance with the Kentucky Rules of Civil Procedure." KRS 13B.160.

---

3. Kentucky Administrative Regulations.

4. Flunixin is an anti-inflammatory drug.

Allen's first argument relates to alleged due process violations in connection with the KHRA decision. He argues that the KHRA offered no proof that flunixin was ever administered to CR Commando, that the evidence against him was "rendered worthless by countless violations of chain of custody standards," that exculpatory evidence in his favor was intentionally destroyed, and that the KHRA failed to meet its burden of proof. While Allen refers to these allegations as due process violations, they basically relate to whether the KHRA decision was arbitrary.

█ The three-part test for determining the arbitrariness of an administrative agency decision concerns whether the agency's action was within the scope of its granted powers, whether the agency provided procedural due process, and whether the decision was supported by substantial evidence. *See Commonwealth, Revenue Cabinet v. Liberty Nat'l Bank of Lexington,* Ky.App., 858 S.W.2d 199, 201 (1993), *citing American Beauty Homes Corp. v. Louisville & Jefferson County Planning and Zoning Comm'n,* Ky., 379 S.W.2d 450 (1964). If the decision of the administrative agency fails to meet any of these standards, it must be considered to be arbitrary. *Liberty Nat'l,* 858 S.W.2d at 201.

█ If the findings of fact of an administrative agency are supported by substantial evidence of probative value, then they are binding on the reviewing court. *See Kentucky Unemployment Ins. Comm'n v. Landmark Community Newspapers of Kentucky, Inc.,* Ky., 91 S.W.3d 575, 578 (2002). The agency's findings must be upheld if based on substantial evidence "even though there exists evidence to the contrary in the record." *Id.* Substantial evidence is defined as "evidence of substance and relevant consequence having the fitness to induce convic-

tion in the minds of reasonable [persons]." *Owens–Corning Fiberglas Corp. v. Golightly,* Ky., 976 S.W.2d 409, 414 (1998). If the administrative agency decision was not supported by substantial evidence, then it was arbitrary or clearly erroneous. *Landmark Cmty. Newspapers,* 91 S.W.3d at 579, *citing Danville–Boyle Co. Planning and Zoning Comm'n v. Prall,* Ky., 840 S.W.2d 205, 208 (1992). If there was substantial evidence to support the agency's decision, it cannot be said to be arbitrary. *Landmark Cmty. Newspaper,* 91 S.W.3d at 579, *quoting Taylor v. Coblin,* Ky., 461 S.W.2d 78, 80 (1970). Furthermore, the KHRA is given great latitude in evaluating the evidence and the credibility of the witnesses appearing before it. *See Fuller,* 481 S.W.2d at 308.

█ Allen first argues that there was no proof that flunixin was ever administered to CR Commando. In support of this argument, he refers to the testimony of Dr. Stephen Barker, Allen's expert witness, who testified that when flunixin is metabolized by the horse's liver, it is excreted as a metabolite which is detectable in the horse's urine for up to 54 hours after being administered. Noting that no metabolites of flunixin were found in the horse's urine, Allen maintains that there was no proof that flunixin was administered to the horse.

Allen has overlooked the testimony of Dr. Norman Hester, technical director for Truesdail Laboratories. While Dr. Hester acknowledged that no metabolites of flunixin were found in the urine, he did testify that flunixin itself was present in the urine sample. He also testified that the absence of metabolite "would support a premise that the drug may have been given immediately before the race." We agree with the circuit court that this testimony was substantial evidence to support

**60**

the KHRA's determination that there was flunixin in the horse's urine sample.

■ As a second due process violation, Allen maintains that the evidence against him was "rendered worthless by countless violations of chain of custody standards." He maintains that the KHRA "must produce complete, unbroken chains of custody for this evidence; if they cannot, the evidence is inadmissible." Allen then set forth various incidents in support of his claim that the chain of custody was broken.

In *Mollette v. Kentucky Personnel Bd.*, Ky.App., 997 S.W.2d 492 (1999), this court held that "it is unnecessary to establish a perfect chain of custody or to eliminate all possibility of tampering or misidentification, so long as there is persuasive evidence that 'the reasonable probability is that the evidence has not been altered in any material respect.'" *Id.* at 495, *citing United States v. Cardenas*, 864 F.2d 1528, 1532 (10th Cir.1989). The KHRA concluded that "[t]he evidence regarding each individual shipment when viewed as a whole supports the conclusion that CR Commando's urine samples were shipped to the designated laboratories and tested by them. In addition, the evidence admitted at the hearing supports the conclusion that there was no tampering or attempt to tamper with any of the shipments to the laboratories." Having reviewed that evidence, we agree that the KHRA's conclusion was supported by substantial evidence.

■ The third due process violation alleged by Allen is that Truesdail intentionally destroyed test results which would have served as exculpatory evidence for him. In *Tamme v. Commonwealth*, Ky., 759 S.W.2d 51 (1988), the Kentucky Supreme Court noted that the lost evidence must "possess an exculpatory value that was apparent before it was destroyed." *Id.* at 54, *quoting California v. Trombetta,*

467 U.S. 479, 489, 104 S.Ct. 2528, 2534, 81 L.Ed.2d 413 (1984). The urine samples taken from the horse were tested three times by Truesdail for flunixin. Allen argues that the first two test results were intentionally destroyed because they failed to show the presence of any prohibitive substance. However, the record does not support his assertion.

When urine samples are received by Truesdail, it is standard operating procedure for it to test the samples for a wide variety of illegal substances. If any of the samples test positive for one or more of these substances, a more thorough test is conducted to confirm the presence of that specific drug. While the results of the initial test are kept by the lab, the actual test plates themselves are destroyed because they are rendered useless by time. There is no evidence that Truesdail purposefully destroyed the test plates so as to harm Allen. Moreover, Allen has provided no evidence in support of his assertion that the test plates which were destroyed were somehow exculpatory in nature. In short, we find no due process violation due to the destruction of these samples.

The fourth due process violation alleged by Allen is that the KHRA failed to meet its burden of proof. The burden of proof in administrative hearings is "by a preponderance of evidence in the record." KRS 13B.090(7). In support of his argument, Allen maintains that the KHRA did not demonstrate that he had ever administered flunixin to CR Commando because there were no metabolites of the drug in the horse's urine. As we have noted, Dr. Hester testified that flunixin was in the urine sample and that the absence of metabolites would support the premise that the drug had been administered immediately prior to the race. In short, there was substantial evidence to support the conclusion that Allen had violated the regulation.

■ Allen's next argument is that the "trainer responsibility rule," the regulation making the trainer the "sole insurer" of the horse for any rules violations, including the presence of prohibited medication, is unconstitutional. He maintains that it is impossible for trainers to comply with such a "zero tolerance" regulation. In support of his argument, Allen cites a study by the Swedish University of Agricultural Science which found that horses may become contaminated from their environment, through no fault of the trainer or owner, by touching surfaces, bedding, hay, and water that may have been in contact with a horse that had received flunixin. Allen further argues that the regulations are unreasonable and unconstitutional because compliance therewith is impossible.

811 KAR 1:090, Section 5, provides as follows:

If the post-race test or tests prescribed in Section 1 of this administrative regulation disclose the presence in a horse of a medication, stimulant, sedative, depressant, local anesthetic, or any foreign substance except as provided by Sections 14 and 15 of this administrative regulation, in any amount, it shall be presumed that the substance was administered by the person having control, care, or custody of the horse.

811 KAR 1:090, Section 7, states as follows:

(1) A trainer shall be responsible at all times for the condition of all horses trained by him.

(2) A trainer shall not start a horse or permit a horse in his custody to be started if he knows, or if by the exercise of reasonable care he might have known or have cause to believe, that the horse has received a medication, stimulant, sedative, depressant, local anesthetic, or any foreign substance except as provid-

ed by Sections 14 and 15 of this administrative regulation.

(3) A trainer shall guard or cause to be guarded each horse trained by him in a manner and for a period of time prior to racing the horse necessary to prevent a person not employed by or connected with the owner or trainer from administering a medication, stimulant, sedative, depressant, local anesthetic, or any foreign substance.

■ "The test of the constitutionality of a statute is whether it is unreasonable or arbitrary." *Buford v. Commonwealth*, Ky.App., 942 S.W.2d 909, 911 (1997), *citing Moore v. Ward*, Ky., 377 S.W.2d 881, 883 (1964). "The statute will be determined to be constitutionally valid if a reasonable, legitimate public purpose for it exists, whether or not we agree with its 'wisdom or expediency.'" *Id., citing Walters v. Bindner*, Ky., 435 S.W.2d 464, 467 (1968). While Allen's arguments relate to the constitutionality of administrative regulations and not statutes, we conclude that the same principles concerning constitutionality apply.

In upholding the constitutionality of the regulations, the circuit court held that the "trainer responsibility rule" was not arbitrary. The court stated that the rule was "a reasonable means to promote safety within the harness racing industry." Further, the court stated that "[d]rug bans would be futile if the regulation required direct evidence or proof of intent before any punishment could be imposed."

Allen has not cited any case from any jurisdiction which holds that the "trainer responsibility rule" is unconstitutional. On the other hand, the KHRA has cited cases from several jurisdictions upholding the constitutionality of such a rule. We agree that the rule is not unconstitutional.

In *Sandstrom v. California Horse Racing Bd.*, 31 Cal.2d 401, 189 P.2d 17 (1948),

the California Supreme Court held that "it is not unreasonable, arbitrary or capricious to provide that the trainer guarantee the condition of a horse running in a race upon the results of which there is wagering." *Id.* at 23. In upholding the constitutionality of a rule similar to that in Kentucky, the court held that the rule was "designed to afford the wagering public a maximum of protection against race horses being stimulated or depressed by making the trainer the insurer of the horse's condition. That the wagering public merits such protection is evident from the magnitude of its patronage." *Id.* at 21.

Similarly, in addressing the argument that actual knowledge of the trainer should be shown and that any rule to the contrary would be unconstitutional, the court in *Fogt v. Ohio State Racing Comm'n,* 3 Ohio App.2d 423, 32 O.O.2d 546, 210 N.E.2d 730 (1965), stated that "[h]orse racing, at its best, is difficult to control, and would be practically impossible to regulate if every governing rule and regulation was made dependent for validity upon the knowledge or motives of the person charged with a violation." *Id.* at 733. The court went on to state as follows:

> [W]hen viewed in the light of its overall purpose, the business to which it relates, and the potential evil which it is designed to prevent, we cannot say that the rule is unreasonable. Manifestly, it would be almost impossible to prove guilty knowledge or intent in cases of this kind, and the futility of prosecutions under a rule requiring probative evidence of guilty knowledge and intent would eventually leave the public interest and welfare to the mercy of the unscrupulous.

*Id.*

Finally, in *Casse v. New York State Racing & Wagering Bd.,* 70 N.Y.2d 589, 523 N.Y.S.2d 423, 517 N.E.2d 1309 (1987), the New York court upheld the validity of the trainer responsibility rule and stated as follows:

> Moreover, the trainer responsibility rule is a practical and effective means of promoting these State interests—both in deterring violations and in enforcing sanctions. The imposition of strict responsibility compels trainers to exercise a high degree of vigilance in guarding their horses and to report any illicit use of drugs, medications or other restricted substances by other individuals having access to their horses. Additionally, the rebuttable presumption of responsibility facilitates the very difficult enforcement of the restrictions on the use of drugs and other substances in horse racing. Indeed, it would be virtually impossible to regulate the administering of drugs to race horses if the trainers, the individuals primarily responsible for the care and condition of their horses, could not be held accountable for the illicit drugging of their horses or for the failure either to safeguard their horses against such drugging or to identify the person actually at fault. It is not surprising, therefore, that trainer responsibility rules have been upheld, almost without exception, in other jurisdictions.

*Id.* at 1312. We agree with the statements set forth in these cases from other jurisdictions, and we hold that the trainer responsibility rule set forth in 811 KAR 1:090 is not unconstitutional.

 Allen next argues that the regulations, as applied to him in this case, unconstitutionally subjected him to double jeopardy. He notes that he was found to have violated the regulations on two separate occasions based on one occurrence. He asserts that research indicates that flunixin present in the horse on October 2, 1998, would likely still be present five days later on October 7, 1998. Allen states that

"[t]wo charges based on one occurrence is clearly a violation of the double jeopardy principle recognized by Kentucky."

 This argument is without merit for three reasons. First, the Double Jeopardy Clause of the Fifth Amendment of the U.S. Constitution "protects only against the imposition of multiple *criminal* punishments for the same offense." *Hudson v. United States,* 522 U.S. 93, 99, 118 S.Ct. 488, 493, 139 L.Ed.2d 450 (1997). [Emphasis in original.] Therefore, as the administrative action in this case was civil in nature rather than criminal, double jeopardy principles do not apply. Second, CR Commando had flunixin in his urine on two separate occasions or races. Therefore, there were two violations. Third, urine testing following the second date revealed an even higher amount of flunixin than after the first date. This evidence leads to the conclusion that additional flunixin was likely administered to the horse after the first race and before the second one. Thus, there is strong evidence that flunixin was administered to the horse on separate occasions prior to each race. In short, there was no double jeopardy violation.

 Allen further argues that his rights to equal protection of the law were violated because Truesdail did not have a written set of standard operating procedures, because thin layer chromatography "is notoriously unreliable and highly variable," because use of flunixin is allowed in thoroughbred racing, and because the KHRA had no standard operating procedure for urine collection. The first, second, and fourth reasons stated above go to the credibility to be given to the test results. Having reviewed the evidence and testimony, we conclude that the test results were sufficiently credible so as to warrant their admissibility. Thus, we find no error in the KHRA's reliance on that evidence.

 Allen's final argument is that prohibiting flunixin in harness racing but not in thoroughbred racing deprives him of the constitutional guarantee of equal protection under the law. The circuit court identified the level of scrutiny for this different treatment as the "rational basis test." In *Commonwealth v. Meyers,* Ky.App., 8 S.W.3d 58 (1999), this court stated that "[t]he appropriate standard of review is whether the difference in treatment ... rationally furthers a legitimate state interest." *Id.* at 61, *quoting Nordlinger v. Hahn,* 505 U.S. 1, 10–11, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992).

Dr. Nancy Davis, veterinarian at the KHRA, testified at the administrative hearing that harness racing and thoroughbred racing are different industries. She noted that a harness horse doesn't have the agility that a thoroughbred has because the harness horse is hooked to a racing bike and is unable to step sideways quickly in order to avoid an accident. She also noted that a harness horse does not have the ability to jump over a down horse due to being hooked to the bike. Dr. Davis concluded that the harness industry had to be careful that it did not allow a sore horse or a lame horse to mask its pain in a race because of the possibility of hurting other horses in the field in the event of an accident. She also opined that a less than sound horse in a harness race is more likely to break its gait and probably lose the race. She stated that in fairness to the betters on the race, there should be no masking of lameness in a horse because lame horses will likely break their gait and lose the race.

In *Barry v. Barchi,* 443 U.S. 55, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979), the U.S. Supreme Court was faced with "whether the State's prohibition of administrative stays

pending a hearing in the harness racing context without a like prohibition in thoroughbred racing denies harness racing trainers equal protection of the laws." 443 U.S. at 67, 99 S.Ct. 2642. In resolving the issue, the Court noted that the appellant therein had not "demonstrated that the acute problems attending harness racing also plague the thoroughbred racing industry." *Id.* Further, the Court stated that the appellant had not shown that the two industries should be regulated identically in all respects or that "the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Id.* at 67–68, 99 S.Ct. 2642, *quoting Vance v. Bradley,* 440 U.S. 93, 111, 99 S.Ct. 939, 950 59 L.Ed.2d 171 (1979). The Court also stated that the state did not have the burden of disproving the appellant's "bare assertions that thoroughbred and harness racing should be treated identically." *Id.* at 68, 99 S.Ct. 2642. Based on Dr. Davis's testimony and the safety considerations which differ between harness racing and thoroughbred racing, we conclude there is a rational basis for treating the two industries differently in this area of racing regulation. Thus, we conclude that the regulation does not violate principles of equal protection.

The order of the Franklin Circuit Court is affirmed.

ALL CONCUR.